**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**CINCINNATI DIVISION**

| | |
|---|---|
| ALEXANDRIA HAINES, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Civil Action No. 1:24-cv-00710-MWM |
| v. | Hon. Matthew W. McFarland |
| CENGAGE LEARNING, INC., | Magistrate Judge Karen L. Litkovitz |
| Defendant. | ORAL ARGUMENT REQUESTED |

**DEFENDANT CENGAGE'S OBJECTIONS TO REPORT AND RECOMMENDATION
ON ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT [ECF NO. 18]**

Defendant Cengage Learning, Inc. ("Cengage") respectfully states the following objections

to the Report and Recommendation regarding Cengage's motion to dismiss the Complaint filed by

Plaintiff Alexandria Haines pursuant to Rule 72(b) of the Federal Rules of Civil Procedure and 28

U.S.C. § 636(b).

**INTRODUCTION**

Plaintiff Alexandra Haines, on behalf of herself and a putative class, filed a single-count

complaint against Cengage for its alleged violation of the Video Privacy Protection Act ("VPPA")

when it, according to Plaintiff, disclosed her personally identifiable information ("PII") to a third

party (here, Meta, f/k/a as Facebook) through Cengage's use of the Meta Pixel technology on its

website. This particular case, although in many respects a derivative of existing Meta Pixel

litigation occurring across the country, is unique in one critical way: Plaintiff here does not identify

*any* specific video materials that were allegedly disclosed by Cengage to Meta. Instead, she

identifies an educational course, which *may* have included various unidentified videos in addition

1

to traditional textbooks and similar learning materials.   This fundamental omission places Plaintiff's complaint in stark contrast to the ones found in the cases relied on in the Report and Recommendations, and the failure to acknowledge this difference constitutes legal error for three independent reasons, each of which provides a basis for the case to be dismissed in its entirety.

First, Plaintiff's claims, as pleaded, cannot stand because the VPPA *only* "creates a private cause of action for plaintiffs to sue persons who disclose information about their **video-watching habits**." *Solomon v. Flipps Media, Inc.*, ---F.4th---, 2025 WL 1256641, at *1 (2d Cir. May 1, 2025) (emphasis added) (quoting *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 278 (3d Cir. 2016)); *see also Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017) ("[The VPPA] protects generally a consumer's substantive privacy interest in his or her **video-viewing history**.") (emphasis added). Accordingly, Cengage objects to the Report's recommendation that Plaintiff has Article III standing, because the alleged injury is not cognizable under the VPPA.

Second, turning to the merits, Cengage objects to the Report's recommendation that Plaintiff has adequately alleged her "personally identifiable information," as that term is understood under the VPPA.  Specifically, Cengage objects to the Report's recommendation that Plaintiff alleged the identity of *specific* video materials, as required by the statute. A review of the complaint, as well as the webpage Plaintiff incorporates by reference, demonstrates that Plaintiff fails to identify *any* specific videos, opting instead to assert that her simple enrollment in an online educational course is enough. Notwithstanding Plaintiff's failure to allege or identify even a *single* video, the Report recommends that the Court find Plaintiff's mere enrollment in an online educational course sufficient to satisfy this obligation. But this is a significant logical leap – one unsupported by existing case law interpreting the precise meaning of "personally identifiable information" under the VPPA. If this unprecedented broad interpretation were permitted to stand

it would create a watershed moment for the innumerable companies using the Meta Pixel on their websites.

Third, Cengage objects to the Report's recommendation that Plaintiff adequately alleged the disclosure of her specific identity. This issue was addressed by the United States Court of Appeals for the Second Circuit two business days before the Report was issued in a decision that demonstrates the legal error in the Report's reasoning on this issue. *See Solomon*, 2025 WL 1256641. In this case, as in *Solomon*, Plaintiff alleges that Cengage disclosed her unique "Facebook ID," known as an "FID," to Meta. The Report recommends that this allegation is sufficient, but this conclusion is fundamentally flawed, In *Solomon*, the Second Circuit unequivocally held that a plaintiff's Facebook ID ("FID") could not alone serve to identify a specific person as required under the VPPA. *See Solomon*, 2025 WL 1256641, at *11. Importantly, the Report could not consider the import of *Solomon* to the present case because it was handed down only two business days before the Report was filed – and consequently relies on at least one case that has since been overturned by the decision. *See* Doc. #18, PAGEID164 (citing *Lee v. Springer Nature Am., Inc.*, --- F.Supp.3d ---, No. 24-cv-4493, 2025 WL 692152, at *15 (S.D.N.Y. Mar. 4, 2025)). Although the Report sidesteps the deepening circuit split over the proper meaning of "personally identifiable information" under the VPPA, the recent guidance from *Solomon*, together with the law of the Third and Ninth Circuits, make clear that this was error or, at the very least, that this issue should be resolved by the Sixth Circuit in the first instance.

## LEGAL STANDARD

This Court reviews de novo those portions of a report and recommendation to which a party raises a timely specific objection. Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b). This Court may enter an order accepting, rejecting, or modifying the report and recommendation in whole or in

3

part. This Court may also receive additional evidence or send the case back to the magistrate judge

with instructions to conduct additional proceedings. *Id.*

## ARGUMENT

**I.      The Report Errs in Recommending Plaintiff Has Article III Standing.**

To begin, the Report concludes that Plaintiff has established Article III standing at this

stage because, "[r]egardless of how the alleged harm is specifically characterized here, it involves

disclosure of private information," which is "a traditional harm recognized by law." Doc. #18 at

PageID158. The Report relies extensively on *Salazar v. Paramount Global*, 133 F.4th 642, 650

(6th Cir. 2025), to reach its conclusion. But the Report misapprehends Cengage's position. As

stated in its initial briefing and at oral argument, Cengage's position is that the Report's

recommendation fails to acknowledge the key deficiencies in Plaintiff's allegations *here*: There is

no video contained on the supposedly offending website; there is no specific video identified on

the supposedly offending website; there is no video name contained in the URL alleged in the

complaint; and there is no video title listed *anywhere* in Plaintiff's allegations. *Cf. Solomon*, 2025

WL 1256641, at *3 (including a snapshot of the URL included there and explaining that the "the

string of characters includes the *specific title* of the video the user accesses").

Notwithstanding these gaps in her pleading, the Report makes a crucial inference in

Plaintiff's favor by concluding that, "[b]ecause plaintiff was a Meta user at the time of this

transaction, defendant . . . transmitted from defendant's website to Meta plaintiff's unencrypted

FID and other information, *including the title and subject matter of prerecorded video materials

plaintiff requested or obtained*." Doc. #18 at PageID150 (emphasis added).   This acceptance of

Plaintiff's conclusory allegations is wholly without support in the complaint and is indeed

contradicted by the URL alleged in the complaint and by the supposedly offending website, which the complaint incorporates by reference.

This unsupported logical leap infects the remainder of the Report's standing analysis, because the cases the Report relies on to find that Plaintiff has Article III standing involved plaintiffs who had, at minimum, done more to identify the specific video materials involved—as the statue requires. *See, e.g. Salazar*, 133 F.4th at 645 ("Salazar claims he used 247Sports.com, a website owned by Paramount that covers college sports recruiting. Salazar alleged that he 'began a digital subscription to 247Sports.com in 2022' and that he watched videos on 247Sports.com 'while logged into his Facebook account.'"); *Eichenberger*, 876 F.3d at 981 (involving a plaintiff who "downloaded the WatchESPN Channel on his Roku device and used it to watch sports-related news and events").

## II. The Report Errs in Recommending Plaintiff Has Adequately Alleged Her "Personally Identifiable Information."

The VPPA defines "personally identifiable information" as "information which identifies a person as having requested or obtained *specific* video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3) (emphasis added). Although it has been observed that "the most ink has probably been spilled over the question of what constitutes personally identifiable information" under the VPPA, the great weight of authority makes clear that "the statute as a whole squarely supports the conclusion that liability under the VPPA should be limited to the disclosure of information that would permit an ordinary person to learn a specific individual's **video-watching history**." *Solomon*, 2025 WL 1256641, at *5, *9 (quotation omitted); *see also Nickelodeon*, 827 F.3d at 290 ("[P]ersonally identifiable information under the Video Privacy Protection Act means the kind of information that would readily permit an *ordinary person* to identify a specific individual's video-watching behavior."); *Eichenberger*, 876 F.3d at

985 (citing *Nickelodeon* and expressly adopting the standard that the information must "readily permit[]an ordinary person to identify a particular individual as having watched certain videos") (internal quotation marks omitted)).

This "ordinary person" standard for evaluating PII has been upheld in the Second, Third, and Ninth Circuits. Only the First Circuit conflicts—utilizing instead a "reasonable foreseeability standard." *Solomon*, 2025 WL 1256641, at *6 (citing *Yershov v. Gannett Satellite Information Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016)). Under the reasonable foreseeability standard, PII is "not limited to information that explicitly names a person,' but also includes information disclosed to a third party that is 'reasonably and foreseeably likely to reveal which videos the plaintiff has obtained.'" *Id.* (quoting *Yershov*, 820 F.3d at 486). Here, the Report recommends refusing to pick a side of this split "because the result is the same under both." Doc. #18 at PageID163. But in so recommending, the Report applies its *own* flawed interpretation of the statute with respect to the Plaintiff's supposed identification of (1) the specific video materials, and (2) the specific individual associated with those video materials. In short, the Report's recommendation has the effect of conflating the general *category* of something—here, an educational course—with something *specific* within that category, as required by the statute.

### A. The Report Incorrectly Recommends That Plaintiff Alleged Specific Video Materials.

Cengage objects to the Report's recommendation that Plaintiff sufficiently alleged the specific video materials allegedly disclosed to Meta. *See* Doc. #18 at PageID161-63. The Recommendation's analysis is flawed for at least two reasons.

First, in an apparently novel interpretation of the VPPA, the Recommendation concludes that "defendant's emphasis on the lack of a specific video title in the complaint does not appear warranted by the text of the statute." Doc. #18 at PageID161. To reach this supposition, the Report

exclusively relies on the definition of "specific" in Black's Law Dictionary: "'Specific' is first defined in Black's Law Dictionary as 'of, relating to, or designating a particular or defined thing.'" *Id.* Applying that definition, the Report reasons as follows:

> Defendant allegedly disclosed to Meta that plaintiff purchased a "Medical Billing and Coding" online course and that it was an "advanced career training" course, both of which denote a particular thing available at a particular URL. Along with plaintiff's other allegations that she purchased "prerecorded video material" (*see, e.g.,* Doc. 1 at PAGEID 4, ¶ 10), the Court finds that plaintiff adequately alleges that defendant disclosed to Meta that she purchased "specific video materials or services" for a VPPA claim.

Doc. #18 at PageID162. But the meaning of "specific video materials" is *not* tantamount to "a particular thing available at a particular URL," and to conclude as such would effectively render the definition limitless—an outcome other courts have adamantly refused to abide when interpreting the VPPA. *See, e.g.*, *Solomon*, 2025 WL 1256641, at *9 ("[L]iability under the VPPA should be limited to the disclosure of information that would permit an ordinary person to learn a specific individual's video-watching history."); *Nickelodeon*, 827 F.3d at 383 ("We do not think that, when Congress passed the [VPPA], it intended for the law to cover factual circumstances far removed from those that motivated its passage."); *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 181 (S.D.N.Y. 2015) ("If nearly any piece of information can, with enough [effort] on behalf of the recipient, be combined with other information so as to identify a person, then the scope of PII would be limitless."); *see also Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975) ("When technological change has rendered [a statute's] literal terms ambiguous, [the statute] must be construed in light of its basic purpose.") (interpreting the Copyright Act). Again, the Report conflates a general category of something (say, for instance, the genre of a movie) with a specific *thing* within the category (information reflecting the specific movie within than genre). This interpretation should be rejected, because it fails to even align with the primary authority

7

relied on by the Report: the Black's Law Dictionary definition for "specific": of, relating to, or designating *a particular or defined thing*.  Plaintiff alleges no "particular or defined" video information was shared.

Nor does the actual text of the VPPA support the Report's interpretation of PII.  Again, the VPPA defines PII as "information which identifies a person as having requested or obtained *specific video materials or services* from a video tape service provider." 18 U.S.C. § 2710(a)(3) (emphasis added). The Report's focus on the word "specific," to the exclusion of the phrase "video materials or services," runs afoul of the "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Salazar*, 133 F.4th at 650 (quoting *West Virginia v. EPA*, 597 U.S. 697, 721 (2022)). Indeed, courts, when interpreting a statute, err when "scrutiniz[ing] a statute atomistically— chopping it up and giving each word the broadest possible meaning." *Id.* That is exactly what happened here, and the Court should decline to adopt such a recommendation on this basis alone.

But the Report goes one step further. Applying an atomistic view of "specific video materials or services," the Report then recommends finding that Plaintiff's conclusory allegation "that she purchased 'prerecorded video material'" satisfied her burden of alleging the specific video materials supposedly disclosed by Cengage. Doc. #18 at PageID162 (quoting Doc. #1, at PageID4, ¶ 10). Even setting aside the aforementioned issues with the Report's analysis on this point, its acceptance of a conclusory allegation is in error. *See D'Ambrosio v. Marino*, 747 F.3d 378, 383 (6th Cir. 2014) ("[T]his court 'need not accept as true legal conclusion or unwarranted factual inferences, and conclusory allegations or legal conclusions masquerading as factual allegations will not suffice.'") (quoting *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 275-76 (6th Cir. 2010)). This error becomes especially apparent when considering that the webpage URL relied on

by Plaintiff in her complaint contradicts her allegations. *See Pippin v. JPMorgan Chase Bank, N.A.*, Case No. 4:24-CV-00552, 2024 WL 5055190, at *3 (N.D. Ohio Dec. 10, 2024) ("Although a court must generally accept all well-pled facts as true, if a document referenced in the complaint . . . contradicts the factual allegations in the complaint, the document 'trumps the allegations.'") (quoting *Amir v. AmGuard Ins. Co.*, 606 F. Supp. 3d 653, 664 (E.D. Mich. 2022))).

The Report recommends an unwarranted inference in Plaintiff's favor because the URL referenced in Plaintiff's complaint links to a webpage that contains no video material, nor reference to any specific video material whatsoever. The complaint alleges the following URL:

| | |
|---|---|
| Request URL: | https://www.facebook.com/privacy_sandbox/pixel/register/trigger/?id=1437036116561317&ev=SubscribedButtonClick&dl=https%3A%2F%2Fwww.ed2go.com%2Fcourses%2Fhealth-and-fitness%2Fmedical%2Fctp%2Fmedical-billing-coding-voucher-included&rl=https%3A%2F%2Fwww.ed2go.com%2Fsearch%3Fterm%3Dmedical%2Bcoding%2CcourseTypes%3Dadvanced-career-training&if=false&ts=1729792198301&cd[buttonFeatures]=%7B%22classList%22%3A%22font-weight-bold%20px-5%20text-uppercase%20btn%2Dbtn-success%22%2C%22destination%22%3A%22https%3A%2F%2Fwww.ed2go.com%2Fenrollment%2Faddtocart.aspx%3Fitem%3DGES1014!pierce-wa%22%2C%22id%22%3A%22checked-enrollment-btn%22%2C%22imageUrl%22%3A%22%22%2C%22innerText%22%3A%22ENROLL%20NOW%22%2C%22numChildButtons%22%3A0%2C%22tag%22%3A%22a%22%2C%22type%22%3Anull%2C%22name%22%3A%22%22%7D&cd[buttonText]=ENROLL%20NOW&cd[formFeatures]=%5B%5D&cd[pageFeatures]=%7B%22title%22%3A%22Medical%20Billing%20and%20Coding%20(Voucher%20Included)%22%7D&cd[parameters]=%5B%5D&sw=3008&sh=1692&v=2.9.174&r=stable&a=tmgoogletagmanager&ec=2&o=4126&fbp=fb.1.1729722869661.37608366883583979&cs_est=true&ler=empty&cdl=API_unavailable&it=1729792195650&coo=false&es=automatic&tm=3&rqm=FGET |
| Request Method: | GET |
| Status Code: | ● 200 OK |
| Remote Address: | 31.13.67.35:443 |
| Referrer Policy: | strict-origin-when-cross-origin |

Doc. #1 at PageID4, ¶ 13.

At most (if anything), this URL indicates that the user might have enrolled in an online educational course. It does not demonstrate that Plaintiff requested, obtained, or viewed any specific video or video materials, as required by the VPPA. Crucially, this URL simply contains the name of a course; it is *not* the name or URL of a video—nor does Plaintiff allege it is. This becomes clear when navigating to the supposedly offending webpage associated with the URL:



## Outline

⌃ **DETAILS**

I. Medical Terminology
    A. Getting Started
    B. How to Take This Course
    C. Test-Out Exam 1: Lessons 1–Midterm Exam
    D. Introduction to Medical Terminology and the Human Body in Health and Disease
    E. The Musculoskeletal System
    F. The Cardiovascular System
    G. The Lymphatic and Immune Systems
    H. The Respiratory System
    I. The Digestive System
    J. The Urinary System
    K. Midterm
    L. Test-Out Exam 2: Lessons 8–Final Exam
    M. The Nervous System
    N. Special Senses: The Eyes and Ears
    O. The Integumentary System
    P. The Endocrine System
    Q. Mental Health
    R. Male and Female Reproductive Systems
    S. Diagnostic Procedures, Nuclear Medicine, and Complementary Medicine
    T. Final Exam
II. Medical Billing and Coding
    A. Introduction to Medical Billing and Coding
        1. Career Opportunities
        2. Personal and Technical Qualifications
        3. Employment Settings
        4. Telecommunications
        5. Professional Certifications
    B. Introduction to Health Insurance
        1. Health Insurance Terminology

## Requirements

**Prerequisites:**

There are no prerequisites to take this course.

**Certification Requirements:**

In order to sit for national certification exams, candidates must have a high school diploma or equivalent. Therefore, it is recommended you have this before enrolling in this course. *Certification exams offered by AAPC and NHA are only available online to candidates located in the US. AHIMA only offers in-person exams in both the US and Globally.*

**Requirements:**

Hardware Requirements:

- This course can be taken on either a PC, Mac, or Chromebook.

Software Requirements:

- PC: Windows 8 or later.
- Mac: macOS 10.6 or later.
- Browser: The latest version of Google Chrome or Mozilla Firefox is preferred. Microsoft Edge is also compatible.
- Microsoft Word or equivalent (not included with enrollment)
- Adobe Acrobat Reader.
- Software must be installed and fully operational before the course begins.

Other:

- Email capabilities and access to a personal email account.

**Instructional Material Requirements:**

The instructional materials required for this course are included in enrollment.

The following digital textbook for the Medical Terminology course is accessed via links in the course lessons:

- *Comprehensive Medical Terminology for Health Professions, 1st Edition* (eBook)

The following digital textbooks for Medical Billing and Coding are accessed via links in the course lessons:

- *Understanding Health Insurance: A Guide to Billing and Reimbursement,* by Michelle A. Green

11

Again, if anything, this webpage demonstrates that Plaintiff may have navigated to this website to learn more about an advanced learning course. It does *not* demonstrate that Plaintiff watched or obtained specific video materials. Nor does the webpage contain even a single video on it.  In fact, in reviewing the information about the identified course, there is no reference *at all* to videos being an included portion of the course. As the Report itself acknowledges, "[t]he webpage includes a host of information about the educational course but does not include the titles of any specific video materials." Doc. #18 at PageID155.  However, the Report wholly ignores that there is not even any *reference* to video materials for the course, instead granting Plaintiff's request for an *assumption* that she enrolled in a "video based course," despite that term being (1) wholly absent from the complaint; and (2) completely unsupported by the website at issue itself.  Therefore, the Report misapplied the Rule 12(b)(6) standard when concluding that Plaintiff adequately alleged that "defendant disclosed to Meta that [Plaintiff] purchased 'specific video materials or services.'" Doc. #18 at PageID162**.**

Finally, the Report relies on certain cases to support its conclusion that "other Courts considering similar complaints have not demanded 'granular' specificity at the pleading stage." Doc. #18 at PageID162. These cases all involve plaintiffs who have alleged far more than Plaintiff here – including that the defendant disclosed the specific name of the video materials watched or obtained by the plaintiff – a level of pleading sufficiency required to establish a claim under the VPPA. *See Martinez v. D2C, LLC*, No. 23-21394, 2023 WL 6587308, at *1, *3 (S.D. Fla. Oct. 10, 2023) (holding that plaintiffs adequately alleged the disclosure of specific video materials or services when the complaint alleged throughout the complaint that the defendant disclosed the "specific video titles" the plaintiffs watched as "paying subscribers to Univision's streaming video-on-demand service"); *Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714, 717 (N.D. Cal.

2023) (involving plaintiffs who were paid subscribers to "a website providing educational videos" where the plaintiffs alleged a URL they argued "contains the name of the video"); *Feldman v. Star Tribune Media Co.*, 659 F. Supp. 3d 1006, 1012 (D. Minn. 2023) (involving a plaintiff who alleged that he "regularly watched" videos on defendant's website and that defendant "simultaneously disclosed his Facebook ID and the name of the video/content that he viewed to Facebook via Facebook Pixel"). The Report's recommendation conflates meeting the statute's requirement for "specific video materials" with what it deems "granular" information. However, without this "granular" information, no VPPA violation has been established.

**B. The Report Incorrectly Recommends That a Facebook ID Permits the Ordinary Person to Identify a Specific Person's Video Watching Habits.**

Cengage further objects to the Report's recommendation that Plaintiff sufficiently alleged the identification of a *specific person's* video watching habits. Doc. #18 at PageID163-64. The Report bases this recommendation on Plaintiff's allegation that Cengage disclosed her FID—again, her Facebook ID number—to Meta. Doc. #18 at PageID164. Although resolution of this issue requires grappling with a circuit split, the Report evades doing so by finding "it unnecessary to adhere to either approach, because the result is the same under both." Doc. #18 at PageID163. The error in this recommendation is twofold.

First, although the Sixth Circuit has not yet weighed in, the great weight of authority confirms that the "ordinary person" standard for PII under the VPPA is the appropriate test. As the Second Circuit has very recently explained:

> [T]he specific context in which [the definition for PII is] used suggests that the definition encompasses information that would permit an ordinary person to identify a specific individual's video-watching behavior, as opposed to information that only a technologically sophisticated third party could use to identify specific consumers. The VPPA imposes liability on a "video tape service provider" that "*knowingly* discloses" a consumer's information to a third party. 18 U.S.C. § 2710(b)(1) (emphasis added). "In other words, the statute views disclosure from the

> perspective of the disclosing party. It looks to what information a video service provider discloses, not to what the recipient of that information decides to do with it." *Eichenberger*, 876 F.3d at 985. It does not make sense that a video tape service provider's liability would turn on circumstances outside of its control and the level of sophistication of the third party. The ordinary person standard is a more suitable framework to determine what constitutes personally identifiable information because it "better informs video service providers of their obligations under the VPPA," while not impermissibly broadening its scope to include the disclosure of technological data to sophisticated third parties.

*Solomon*, 2025 WL 1256641, at \*9. District courts across the country have agreed, employing the ordinary person standard for PII. *See, e.g.*, *Feldman*, 659 F. Supp. 3d at 1020-21; *Edwards v. Learfield Comm., LLC*, 697 F. Supp. 3d 1297, 1307-08 (N.D. Fla. 2023); *Lebakken v. WebMD, LLC*, 640 F. Supp. 3d 1335, 1341-42 (N.D. Ga. 2022). This Court can, and the weight of authority suggests that it *should*, adopt the ordinary person standard for PII to determine the sufficiency of Plaintiff's allegations.

Second, applying the ordinary person test, it becomes clear that Plaintiff has failed to adequately allege the disclosure of her specific identity. In *Solomon*, the Second Circuit unequivocally held that a person's FID does *not* permit the ordinary person to connect that person's specific identity with the fact of his or her request for or consumption of specific video materials. 2025 WL 1256641, at \*11. Just like Plaintiff here, the plaintiff in *Solomon* argued that her FID was sufficient to identify her specifically, as required by the VPPA. Specifically, Solomon alleged that she could be identified by simply entering "facebook.com/Solomon's FID" into any web browser, and that this was enough for the VPPA (just as Plaintiff did here). *Id.* The Second Circuit disagreed, observing that an ordinary person could not "identify Solomon through her FID," because the complaint "lack[ed] any details about how an ordinary person might access the information" that itself was stored by Meta's proprietary system and, assuming a person *could* access the information, the complaint was "devoid of any details about *how* an ordinary person

would use an FID to identify Solomon." *Id.*; *see also In re Nickeloodeon*, 827 F.3d at 283 ("To an average person, an IP address or a digital code in a cookie file would likely be of little help in trying to identify an actual person."). Plaintiff here suffers from the same infirmities in her pleading, and so this Court should adopt the Second Circuit's reasoning and conclude that Plaintiff's allegations do not suffice.

## CONCLUSION

For the foregoing reasons, Cengage respectfully objects to the Recommendations made in the Report with respect to its conclusion about Plaintiff's Article III standing and the sufficiency of Plaintiff's PII allegations for her VPPA claim. Accordingly, this Court should modify and/or reject these recommendations and grant Cengage's motion to dismiss Plaintiff's complaint.

Dated: May 19, 2025                                        Respectfully submitted,

By: */s/ Jennifer Snyder Heis*
Jennifer Snyder Heis (0076181) (Trial Attorney)
Kevin M. Bandy (0095721)
UB GREENSFELDER LLP
312 Walnut Street, Suite 1400
Cincinnati, OH 45202
Telephone: (513) 698-5058
Fax: (513) 698-5001
jheis@ubglaw.com
kbandy@ubglaw.com

Matthew C. Wolfe (admitted *pro hac vice*)
SHOOK, HARDY & BACON L.L.P.
111 S. Wacker Dr., Suite 4700
Chicago, IL 60606
Telephone: (312) 704-7700
Fax: (312) 558-1195
mwolfe@shb.com

Jenn O. Hatcher (admitted *pro hac vice*)
Kevin M. Cole (admitted *pro hac vice*)
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd
Kansas City, MO 64108

Telephone: (816) 474-6550
Fax: (816) 421-5547
jhatcher@shb.com
kcole@shb.com

***Counsel for Defendant,***
***Cengage Learning, Inc.***

**CERTIFICATE OF SERVICE**

I hereby certify that on May 19, 2025, I electronically filed the foregoing **Defendant's Objections to the Report and Recommendations on its Motion to Dismiss Plaintiff's Complaint** with the Clerk of the Court using the CM/ECF System.


*/s/ Jennifer Snyder Heis*
*Counsel for Defendant Cengage Learning, Inc.*