# EXHIBIT B

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## CINCINNATI DIVISION

| | |
|---|---|
| VICTORIA LOVETT, individually and on behalf of all others similarly situated,<br><br>                      Plaintiff,<br>      v.<br><br>CONTINUED.COM, LLC,<br><br>                Defendant. | Case No. 1:24-cv-00590<br><br><br>**District Judge: Hon. Douglas R. Cole**<br><br>**ORAL ARGUMENT REQUESTED[1]** |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

---

[1] Currently, this case is listed as being "Closed on 07/01/2025." Plaintiff respectfully requests that this case be reopened to reflect the pending nature of this case.

Plaintiff Victoria Lovett, by and through undersigned counsel, submits this response in opposition to Defendant's motion to dismiss, (Doc. 17, "Motion" or "Mot.")), filed by Defendant Continued.com, LLC. ("Defendant" or "Continued").

## INTRODUCTION

On October 16, 2024, Plaintiff commenced this class action against Defendant to redress the systematic, continuous, and routine violation of Ms. Lovett's and other consumers' privacy rights as established by the Video Privacy Protection Act, 18 U.S.C § 2710 ("VPPA"). (Doc. 1, Compl.). On November 27, 2024, Defendant moved to dismiss the complaint. (Doc. 6). On July 1, 2025, the Court granted Defendant's motion, finding *inter alia* that the complaint did not plausibly allege a claim under the VPPA because Plaintiff "allege[d] that Continued disclosed her FID and her website subscription, not the specific videos or content she viewed." (Doc. 14 at PageID 119).

On July 8, 2025, Plaintiff filed the First Amended Complaint, curing the deficiencies previously mentioned by the Court and crystallizing that Defendant's conduct involves personally identifiable information in two ways. (*See* Doc. 16, "FAC"). Over the past two years, Defendant has used the Meta Pixel powered by Meta Platforms, Inc. to disclose information identifying Plaintiff and consumers as having requested or obtained specific video materials **and** specific video services. *See* 18 U.S.C. § 2710(b)(1). Faced with new and unavoidable allegations depicting Defendant's unlawful disclosures violative of the VPPA, Defendant again moves to dismiss the First Amended Complaint ("FAC") for failure to state a claim pursuant to Rule 12(b)(6) on the same three separate grounds as before: (1) the FAC fails to adequately allege that Defendant is a videotape service provider as defined in 18 U.S.C. § 2710(a)(4) (Doc. 17, Mot., at PageIDs 161-65); (2) the FAC fails to adequately allege that Defendant disclosed her "personally identifiable information" to Meta. (*see id.* at PageIDs 165-69); and (3) the FAC fails to adequately allege that

Defendant "knowingly" disclosed her personally identifiable information to Meta. (*see id.* at PageIDs 169-171). Defendant's arguments are baseless for several reasons.

First, the FAC alleges Defendant is a "videotape service provider" because Defendant offers video services for sale on various websites in the form of an unlimited access package or subscription to prerecorded videos, and separately, Defendant hosts and streams those prerecorded videos online to consumers nationwide wherever they choose to access that material. (*See* FAC, ¶¶ 42, 44, 46-48, 90 at PageIDs 135-38, 149-150). Defendant disingenuously suggests that the VPPA's "similar audio visual materials" language does not extend to online videos or streaming platforms, only to physical media like cassette tapes. But Defendant's Motion has cited no case to support that argument—because no such case exists. Defendant's argument also ignores the fact that the VPPA was amended in 2013 specifically to account for the rise of internet-based streaming services. *See* H.R. REP. NO. 112-312, at 3 (2013). Defendant's outdated reading of the VPPA is unsupported by the legislative history or the legion of cases with contrary holdings. *See, e.g., Salazar v. Nat'l Basketball Assn.*, 118 F.4th 533, 553 (2d Cir. 2024) ("The VPPA is no dinosaur statute. […] Our modern means of consuming content may be different, but the VPPA's privacy protections remain as robust today as they were in 1988.").

Second, the FAC adequately alleges Plaintiff is a "consumer" as defined by 18 U.S.C. § 2710(a)(1) because she and the putative class "each purchased a subscription to a total access video service and requested or obtained prerecorded videos from one of Defendant's Websites that were sold and delivered to them by Defendant." (*See* FAC, ¶ 91 at PageID 150). Defendant's only counterargument to this allegation is found in a footnote and rests entirely on the flawed assumption that Defendant is not a "videotape service provider." Such a skeletal argument is plainly insufficient. It even waives Defendant's ability to raise the argument because Defendant forces "the court to put flesh on its bones." *Northgate Lincoln-Mercury Inc. v. Ford Motor Co.*, 507 F. Supp.

3d 940, 947 (S.D. Ohio 2020) (quoting and citing *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997)).

Third, the FAC adequately alleges Defendant disclosed her personally identifiable information. It alleges that the transmissions from the Defendant's configuration of the Meta Pixel reveal (1) the specific titles of the video service (and URL); (2) specific titles of the video materials requested using that service (and URL); and (3) the consumer's FID—a unique identifier which is connected to only one Meta profile; Plaintiff alleges she has such a profile. (*See* FAC, 76 at PageID 145). To require more, as Defendant urges, impermissibly elevates the pleading standard on a motion to dismiss. Defendant alternatively argues for the adoption of the "ordinary person" interpretation of "personally identifiable information," not used in the Sixth Circuit. Neither of Defendant's arguments has merit because the FAC satisfies even the more demanding approach.

Finally, the FAC adequately alleges Defendant acted knowingly in its operation of the Meta Pixel. Defendant has cited no authority to the contrary. Nor can it. Therefore, the FAC plausibly states a claim for violation of the VPPA, and the Motion should be denied.

## **APPLICABLE LEGAL STANDARD**

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008). "Generally, in considering a motion to dismiss, the district court is confined to considering only the pleadings." *Elec. Merch. Sys. LLC v. Gaal*, 58 F.4th 877, 883 (6th Cir. 2023). To survive dismissal, a plaintiff's complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009). A plaintiff meets this standard by alleging "either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory." *Jones v. Ohio Dep't of Pub. Safety*, No. 2:22-CV-3692, 2024 WL 495529, at *4 (S.D. Ohio Feb. 7, 2024).

## ARGUMENT

To state a claim under the VPPA, a plaintiff must allege that "[a] video tape service provider . . . knowingly disclose[d], to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710 (b)(1). Thus, a plaintiff states a VPPA claim by alleging facts plausibly showing that the following four elements are satisfied: (1) the defendant is a "video tape service provider," (2) the defendant disclosed "personally identifiable information concerning [the plaintiff]" to "any person," (3) the defendant's disclosure of such information was made knowingly, and (4) such disclosure was not authorized by one of the exceptions found in section 2710(b)(2). *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015). Because Defendant only asserts a substantive challenge to the first three elements, only those elements are addressed below.

### I.     The FAC Adequately Alleges that Defendant is a "Video Tape Service Provider"

First, Defendant argues that it is not a "videotape service provider" because it "does not rent, sell, or deliver 'prerecorded video cassette tapes'" and the phrase "similar audio visual materials" does not extend to modern-day technological streaming platforms. (*See* Doc. 17, Mot., at PageIDs 162-64). Defendant's archaic reading of the VPPA is incorrect. Here is why.

The VPPA defines "video tape service provider" as "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes **or similar audio visual materials**[.]" 18 U.S.C. § 2710 (a)(4) (emphasis added). When construing a statute, the "primary rule . . . is that a court will not look beyond the statutory text if

the text is unambiguous." *Olden v. LaFarge Corp.*, 383 F.3d 495, 506 (6th Cir. 2004). Where, as here, "a word is not defined by statute, courts construe the undefined term in accord with its ordinary or natural meaning. *See Ltd., Inc. v. Comm'r*, 286 F.3d 324, 333 (6th Cir. 2002). "To give the term its ordinary meaning, we utilize the 'normal tools of statutory interpretation,' and discern how '[the term] was commonly understood' at the time Congress used it[.]" *Keeley v. Whitaker*, 910 F.3d 878, 882 (6th Cir. 2018) (internal citations omitted). "Where, however, 'the language is ambiguous or leads to an absurd result,' courts may rely on extra-textual sources, such as legislative history or administrative guidance, to interpret a statute." *Donovan v. FirstCredit, Inc.*, 983 F.3d 246, 253 (6th Cir. 2020). "Of course, if the statutory text and legislative history are consistent, this primary rule is unnecessary because the result will be the same regardless of whether a court follows the rule or not." *Olden v. LaFarge Corp.*, 383 F.3d at 506.

In this case, Defendant argues the VPPA only regulates providers of audio visual materials in the physical forms that existed in 1988, which rests on a flawed and an overly narrow reading of the phrase "similar audio visual materials." Such a reading has not been adopted by any court. The statutory definition of "video tape service provider" includes providers of *any* "audio visual materials" that are "similar" to "prerecorded video cassette tapes" – without imposing any requirement that such materials be provided in physical, tangible form. The word "material" is defined "both as 'relating to substance' and as 'Text or images in printed or electronic form; also with distinguishing word, as *reading material, etc.*'" *In re Hulu Priv. Litig.*, No. C 11-03764 LB, 2012 WL 3282960, at *5 (N.D. Cal. Aug. 10, 2012) (quoting Oxford English Dictionary, Third Edition, March 2001). And the word "similar" is defined as "[a]lmost the same, but not identical." *See Similar*, Webster's Dictionary 223 (digital archive 1988 ed.), available at https://archive.org/details/webstersdictiona0000unse_i9t3/. Thus, "similar audio visual materials" means any prerecorded audio visual material that is almost the same as, but not identical to,

prerecorded video cassette tapes, including prerecorded audio visual content in digital form, regardless of the method of its delivery (on the internet or otherwise). *See e.g., In re Hulu Priv. Litig.*, 2012 WL 3282960, at *5 ("a plain reading of a statute that covers videotapes and 'similar audio visual materials' is about the video content, not about how that content was delivered (e.g. via the Internet or a bricks-and-mortar store)"); *Louth v. NFL Enterprises LLC*, No. 1:21-CV-00405-MSM-PAS, 2022 WL 4130866, at *4 (D.R.I. Sept. 12, 2022) (explaining that the word "prerecorded" modifies both "video cassette tapes" and "similar audio visual materials" in the definition of "video tape service provider"); *Osheske v. Silver Cinemas Acquisition Co.*, 700 F. Supp. 3d 921, 926 (C.D. Cal. 2023) (recognizing that "courts have expanded the VPPA to cover businesses that allow consumers to stream video content directly into their home").

This conclusion is confirmed by the VPPA's legislative history. In response to a newspaper's publication of then-Supreme Court nominee Judge Robert H. Bork's video rental history, consisting of 146 films that Judge Bork and his family had rented from a video store, Congress enacted the VPPA "to preserve personal privacy with respect to the rental, purchase, or delivery of video tapes or similar audio visual materials." *See* Pub. L. No. 100–618, preamble; S. Rep. No. 100–599, at 5 (1988), *reprinted in* 1988 U.S.C.C.A.N. 4342–1. In 2012, Congress amended the VPPA "to reflect the realities of the 21st century," for the explicit purpose of bringing internet-based video and streaming services into the fold. 158 Cong. Rec. H6849–01 (Dec. 18, 2012). As the House Judiciary Committee explained,

> When this law was originally enacted in 1988, consumers rented movies from brick-and-mortar videos stars such as Blockbuster. Today, not only are VHS tapes obsolete, so too are traditional video rental stores. The Internet has revolutionized how consumers rent and watch movies and television programs. Video stores have been replaced with "on-demand" cable services or Internet streaming services that allow a customer to watch a movie or TV show from their laptop or even their cell phone. […] Website operators also share in the responsibility to protect consumer privacy[.]

H.R. Rep. No. 112-312, at 3 (2013).

The 2012 amendment, however, left the definition of "videotape service provider" untouched—clearly demonstrating that Congress found the definition, as originally drafted in 1988, broad enough to continue to encompass providers of audiovisual materials in the 21st century. including by bringing within its scope modern day companies (like Defendant) that provide "prerecorded . . . audio visual materials" to consumers in digital mediums that did not even exist at the time of the statute's enactment in 1988. *See Collins v. Toledo Blade*, 720 F. Supp. 3d 543, 548 n.4 (N.D. Ohio 2024); *In re Hulu Priv. Litig.*, 2012 WL 3282960, at *6 ("The question is whether the mechanism of delivery here—streaming versus bricks-and-mortar delivery—ends this case at the pleading stage . . . Given Congress's concern with protecting consumers' privacy in an evolving technological world, the court rejects the argument."); *Feldman v. Star Trib. Media Co. LLC*, 659 F. Supp. 3d 1006, 1021 (D. Minn. 2023) (surveying and collecting cases for the same proposition).

Indeed, "the Senate Report [concerning the VPPA] confirms that Congress was concerned with protecting the confidentiality of private information about viewing preferences regardless of the business model or media format involved." *In re Hulu Priv. Litig.*, 2012 WL 3282960, at *6 (citing S. Rep. No. 100–599 at 1 (VPPA follows a long line of statutes passed by Congress to extend privacy protections to records that contain information about individuals); *id.* at 3 (quoting Senator Leahy's denouncement of the disclosures: "It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read.... In an era of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch.... I think that is wrong, I think that is Big Brother, and I think it is something we have to guard against"); *id.* at 2–4 (extensive discussion of privacy, including

Supreme Court case law and noting that protecting an individual's choice of books and films is a pillar of intellectual freedom under the First Amendment).).[2]

Both the plain language of the statute and the relevant legislative history therefore confirm that "Congress used 'similar audio video materials' to ensure that [VPPA]'s protections would retain their force even as technologies evolve." *In re Hulu Priv. Litig.*, 2012 WL 3282960, at *6. For the avoidance of doubt, however, nearly every court has agreed with Plaintiff's interpretation and has consistently applied the VPPA to streaming platforms and prerecorded video materials offered online. *See Berryman v. Reading Int'l, Inc.*, 763 F. Supp. 3d 596, 604 (S.D.N.Y. 2025) ("The term 'video tape service provider' has widely been held by courts in this District to include websites and streaming services that deliver online video content to consumers."); *Manza v. Pesi, Inc.*, No. 24-CV-690-JDP, --- F. Supp. 3d ----, 2025 WL 1445762, at *1 (W.D. Wis. May 20, 2025); *Collins*, 720 F. Supp. 3d at 548 n.4; *In re Hulu Priv. Litig.*, 2012 WL 3282960, at *6; *Feldman v. Star Trib. Media Co. LLC*, 659 F. Supp. 3d at 1021. Because the FAC alleges Defendant is a company engaged in the sale of an online video service akin to a streaming service that itself hosts prerecorded videos for consumers to purchase and Defendant delivers the same to consumers, (*see* FAC, ¶¶ 42, 44, 46-48, 90 at PageIDs 135-38, 149-150), the FAC plausibly alleges Defendant is a "video tape service provider" as defined in the VPPA. The Motion asserting this basis for dismissal should therefore be denied.

---

[2] Thus, "Congress's concern with privacy and protecting the confidentiality of an individual's choices is relevant context to the Senate Report's discussion of 'similar audio visual materials, such as laser discs, open-reel movies, and CDI technologies.'" *In re Hulu Priv. Litig.*, 2012 WL 3282960, at *6 (quoting S. Rep. No. 100–599 at 12). "Considering both together does not suggest—as [Defendant] argues—an intent to limit the VPAA to tangible materials but—as Plaintiff[] argue[s]—instead suggests Congress's intent to cover new technologies for pre-recorded video content." *In re Hulu Priv. Litig.*, 2012 WL 3282960, at *6. "Indeed, the Senate Report discusses extensively the concept of privacy in an evolving technological world." *Id.*

II.     **The FAC Adequately Alleges Defendant Disclosed Plaintiff's "Personally Identifiable Information" to Meta**

Second, The Motion argues the FAC fails to allege Defendant disclosed Plaintiff's personally identifiable information because (1) "Plaintiff does not allege that her Meta account contains any of her personal information, such as her name or email address," and (2) "[the FAC] still fails to plausibly allege that an ordinary person reviewing a Pixel transmission would readily identify Plaintiff personally and her SpeechPathology.com video history." (Doc. 17, Mot., at PageIDs 166-68). Each of Defendant's arguments is unavailing.

As explained above, "personally identifiable information" includes "information which identifies a person as having requested or obtained specific video materials or services from a videotape service provider." 18 U.S.C. § 2710 (a)(3). The Sixth Circuit has not yet interpreted the phrase as it is used in the VPPA. The First Circuit has interpreted "personally identifiable information" to reach information that is "information reasonably and foreseeably likely to reveal" which videos a consumer has requested or obtained. *See Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016). The Third and Ninth Circuits have interpreted "personally identifiable information" to reach information that "would readily permit an ordinary person to identify a specific individual's video-watching behavior." *See In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 290 (3d Cir. 2016). District courts interpreting the ordinary person approach require that the complaint plead "1) a user's identity; 2) the identity of the video material; and 3) the connection between the two[.]" *In re Hulu Priv. Litig.* [*Hulu III*], 86 F. Supp. 3d 1090, 1097 (N.D. Cal. 2015). This Court should adopt the First Circuit's approach, but the FAC satisfies either standard.

a.      **Plaintiff's Identity**

Concerning identity, the FAC specifically alleges that "Defendant uses . . . the Meta Pixel to disclose to Meta the unencrypted FID of the purchaser," "the fact that the person is requesting or obtaining a video service from Defendant's website," "the unencrypted FID of the subscriber" who is using their subscription, and "the titles of the specific videos requested or obtained on Defendant's website." (*See* Doc. 16, FAC, ¶¶ 54, 73-74, at PageIDs 139, 144). The FAC defines an FID as "a unique sequence of numbers linked to a specific Meta profile," which is persistent and does not change, and that tracks a person on "different websites and across the Internet even after the consumer's browser history has been cleared." (*See id.* at ¶¶ 3, 57, at PageIDs 123, 140). The FAC further alleges that "Meta has assigned to each of their users an 'FID' number – a unique and persistent identifier that allows anyone to look up the user's unique Meta profile and thus identify the user by name[.]" *See id.* at 57, at PageID 140. "[A]ny ordinary person could learn the identity of the person to whom the FID corresponds . . . by accessing the URL www.facebook.com/ and inserting the person's FID." *See id.* at 76, at PageIDs 144-45. Accessing that web URL would direct any person to the Meta profile in question that the FAC alleges reveals the corresponding Facebook user's "first and last name, birth date, gender, and phone number or email address." *See id.* at ¶¶ 3, 55, at PageIDs 123, 139-140. The FAC then ties all these generic allegations to Plaintiff by alleging that she (1) "is, and at all times relevant hereto was, a user of Meta;" (2) "purchased a specific video service from Defendant's website on or about August 15, 2023. . . by registering and paying for a video service and providing her email address, payment information, and zip code;" and (3) "Plaintiff had a Meta account, a Meta profile, and an FID associated with such profile." (*See id.* at ¶¶ 8-12, at PageIDs 124-25).

Many courts applying the ordinary person standard have found allegations of disclosure of one's identity analogous to those alleged in the FAC to be sufficient to withstand a motion to dismiss. *See Haines v. Cengage Learning, Inc.*, No. 1:24-cv-710, ECF No. 18, at PageID 163-64

10

(May 5, 2025 S.D. Ohio) (report and recommendation by Chief Magistrate Judge finding that "[t]he Court finds it unnecessary to adhere to either approach, because the result is the same under both. Defendant (or indeed, any ordinary person) need only append an individual's FID number sequence to "Facebook.com/" to generate that individual's Meta profile, which in turn contains an individual's name and other information."); *Collins*, 721 F. Supp. 3d at 287-88 (collecting cases to support the conclusion that "[e]ven applying the narrower, more demanding approach, however, courts in this District have uniformly held that disclosure of a "Facebook ID [ ] would readily permit an ordinary person to identify a specific individual's video-watching behavior" and courts applying the First Circuit's test "have consistently held that a Facebook ID readily permits an ordinary person to identify the particular user accessing or requesting a specific video. In several of these cases, the Facebook ID was transmitted through a c_user cookie in a manner identical to the one alleged in Collins' Complaint."); *Jackson v. Fandom, Inc.*, No. 22-CV-04423-JST, 2023 WL 4670285, at *4 (N.D. Cal. July 20, 2023) (applying the ordinary person test and finding that "the Court may reasonably infer that an ordinary person could readily identify a specific Facebook user on the basis of a Facebook Profile ID.").

Defendant resists this conclusion by citing *Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714, 720 (N.D. Cal. 2023) and *Edwards v. Learfield Commc'ns*, 697 F. Supp. 3d 1297, 1307 (N.D. Fla. 2023). Neither case is factually applicable: the complaints in those cases lacked allegations that the linked Facebook profiles contained any personal information, like names or birthdays, while the FAC specifically alleges disclosure of the contents of Plaintiff's Facebook profile. In the presence of such allegations, "[m]ost, if not all, courts to address the question have found at the pleading stage that Facebook IDs are PII." *Ghanaat*, 689 F. Supp.3d at 720. Moreover, other courts have rejected the contention that a plaintiff must provide hyper-specific details listing the contents of their Facebook profiles. *See Jackson*, 2023 WL 4670285, at *4; *Lee*

11

*v. Plex, Inc.*, 773 F. Supp. 3d 755, 773 (N.D. Cal. 2025) ("But, as noted above, most courts have not required plaintiffs asserting VPPA claims to plead such granular details."); *see generally Manza*, 2025 WL 1445762, at * (finding a defendant's "argument fails because it rests on the assumption that a complaint must allege every fact that the plaintiff must ultimately prove."). The Court should join the majority of courts holding that a plaintiff need not plead the granular information that Defendant suggests at the pleading stage.

> **b.  Specific Video Materials AND Video Services**

Concerning the identity of the video material, the FAC tracks the language of the VPPA by alleging that the information Defendant discloses includes specific video materials and specific video services. *See* 18 U.S.C. § 2710 (a)(3). Specifically, the FAC alleges "the Meta Pixel technology that Defendant intentionally installed on its Websites transmits (1) the consumer's FID, (2) the specific title of the video service, (3) the specific title of the videos requested or obtained using that package, and (4) the URL where the video service is available for purchase or the specific prerecorded videos are available for viewing, without the consumer's consent and in clear violation of the VPPA." (*See* Doc. 16, FAC, ¶¶ 54, at PageID 139). Far from a formulaic recitation of the VPPA's elements, the FAC goes further to allege that "the Meta Pixel also disclosed the exact moment that the 'play' button was clicked, signifying that the consumer (by contemporaneous disclosure of the FID) took that action directed to the specific video on Defendant's website." (*See id.* at 45, at PageID 136). It also provides an exemplar and alleges that "clicking 'Join Now' [button] shown above, Defendant's configuration of the Meta Pixel disclosed the consumer's FID alongside their 'subscription' to the total access video service and a custom URL associated therewith." (*See id.* at 49, at PageID 138).

The FAC specifically ties the identity and video material allegations directly to Plaintiff's experience by alleging that in August 2023 "[w]hen Plaintiff purchased her video service and

accessed prerecorded videos from Defendant's website using that service, Defendant disclosed to Meta Plaintiff's FID, the URL identifying the specific video service she purchased, and the title of the specific videos she requested or obtained (and URLs where they are available) using that service among other information about Plaintiff and the device she used to make the purchase." (*See id.* at ¶¶ 9, 12, at PageIDs 124-25). Concerning the connection between a user and the video material, the FAC specifically alleges that Defendant's configuration of the Meta Pixel is designed to carry out contemporaneous disclosures of the video or video service package title and FID, so "each transmission of information made from a company's website to Meta via the Meta Pixel is accompanied by, inter alia, the FID of the website's visitor." (*See id.* at ¶¶ 57, 64-65, at PageIDs 140, 142).

These well-pleaded allegations are sufficient to satisfy the ordinary person concerning specific video materials—that is, video viewing history. *See Collins*, 721 F. Supp. 3d at 288 (element satisfied where the complaint alleged disclosure of "the video title and URL were transmitted to Meta"); *Jackson*, 2023 WL 4670285, at *5 ("Jackson alleges that the Pixel logs which pages are visited, buttons are clicked, and, in this case, which videos a user requested and viewed on Fandom," and that Fandom discloses to Meta the full name of each video a user watched, together with the user's Facebook Profile ID . . . Taking the facts alleged in the complaint as true and construing all inferences in Jackson's favor, Jackson plausibly alleges that Fandom disclosed her video viewing history to Meta, which included her having obtained specific video materials or services.") (internal quotation marks omitted); *Golden v. NBCUniversal Media, LLC*, 688 F. Supp. 3d 150, 159 (S.D.N.Y. 2023) (allegations sufficient); *Martinez v. D2C, LLC*, No. 23-21394-CIV, 2023 WL 6587308, at *4 (S.D. Fla. Oct. 10, 2023) ("Assuming the "ordinary person" standard applies, as Univision submits, the Court finds the proposed amended complaint's allegations sufficient").

13

Additionally, these well-pleaded allegations are sufficient to satisfy the ordinary person concerning specific video services because the plain language of the VPPA covers services in addition to specific video titles. *See* 18 U.S.C. § 2710 (a)(3). In addition to the VPPA's plain text, courts interpreting the first category of "personally identifiable information" have held that specific titles of videos need not be alleged in order to withstand a motion under Rule 12(b)(6). *See Kueppers v. Zumba Fitness LLC*, No. 0:24-cv-61983, ECF No. 23 (S.D. Fla. May 8, 2025) (collecting cases to support why "the Court joins these district courts in finding that a plaintiff bringing a VPPA claim **need not allege that the specific video titles were disclosed** . . . .") (emphasis added).[3] Indeed, Chief Magistrate Judge Karen Litkovitz from this District recently issued an R&R examining the VPPA's plain text and reporting that a "defendant's emphasis on the lack of a specific video title in the complaint does not appear warranted by the text of the statute." *See Haines*, No. 1:24-cv-710, ECF No. 18, at PageID 161.[4] Therefore, the natural reading of the second category under VPPA— video "services"—counsels that a plaintiff need not allege specific titles of the services, either because, as the Sixth Circuit just clarified, "the examples enumerated in the text are intended to be illustrative, not exhaustive." *See Salazar v. Paramount Glob.*, 133 F.4th 642, 652 (6th Cir. 2025). Thus, upon proper construction of the statute as explained herein, this Court should find Plaintiff has adequately alleged personally identifiable information based on Defendant's disclosure of video services.

Defendant's reliance on *Wilson v. Triller*, 598 F. Supp. 3d 82, 92 (S.D.N.Y. 2022) fails because, as the Motion identifies, it did not involve the Meta Pixel, and the information disclosed was anonymized. Neither is true in this case. Therefore, *Wilson* is irrelevant.

### c. Ordinary Person

---

[3] *Kueppers* is attached as **Exhibit A**, as the decision is not available on Westlaw or LexisNexis.

[4] Plaintiff notes that the R&R issued in *Haines* has not yet been adopted by the district judge.

Defendant further resists the conclusion that the FAC satisfies the ordinary person test by citing a recent Second Circuit decision, *Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 45 (2d Cir. 2025). *Solomon* is unavailing for several reasons.

First, *Solomon* conflicts with every other Circuit's interpretation of the phrase "personally identifiable information" because that decision leaves no room for numerical identifiers in tracking technology cases to ever support a VPPA claim. *Compare Solomon*, 136 F.4th at 54 ("But even assuming, *arguendo*, that an ordinary person could somehow gain access to the Pixel's PageView, the Complaint is also devoid of any details about *how* an ordinary person would use an FID to identify **Solomon**" and finding that an FID is no different from the unique device identifiers held to be insufficient "in *Nickelodeon*, 827 F.3d at 262, and the Roku device serial numbers in [*Eichenberger v. ESPN, Inc.*, 876 F.3d 979 (9th Cir. 2017)]"), *with In re Nickelodeon*, 827 F.3d at 289 n.174 ("[s]ome disclosures predicated on new technology, such as the dissemination of precise GPS coordinates or customer ID numbers, may suffice."); *Eichenberger*, 827 F.3d at 986 ("And modern technology may indeed alter—or may already have altered—what qualifies under the statute. A Facebook link or an email address may very well readily enable an 'ordinary person' to identify an individual."); *and Yershov*, 820 F.3d at 486. Plainly put, the Second Circuit did not adopt the "ordinary person" approach and instead crafted its own "direct access and understanding" approach requiring that a plaintiff allege, if can, how an average person would directly access and understand information existing in digital format to reveal that a consumer requested or obtained specific video materials or services from a videotape service provider. Therefore, Defendant's argument is incoherent as far as it argues in favor of the ordinary person standard because that same argument is contradicted by Defendant's later request for this Court to adopt *Solomon*'s approach, which creates an entirely new approach divorced from the VPPA's plain text. Defendant cannot have it both ways.

Second, *Solomon* was incorrectly decided because its restrictive interpretation contradicts the VPPA's purpose by effectively immunizing most modern data collection practices from liability, which is the opposite of what Congress intended when it sought to protect video privacy in the digital age. *See Manza*, 2025 WL 1445762, at *8 ("That purpose is not served by allowing video tape service providers and third parties to knowingly evade the statute by disclosing a customer's identity with a number unknown to the 'ordinary person' but known by the recipient. It is rarely the 'ordinary person' who is seeking to invade a consumer's privacy."). Judge Peterson from the Western District of Wisconsin engaged *Solomon* head-on, finding error in every reason advanced by the Second Circuit to justify their reliance on other tools of statutory construction in crafting its rule. In doing so, the court refuted the conclusion:

> that a narrower interpretation is supported by legislative history and the purpose of the VPPA . . . But there are no references to the "ordinary person" standard or anything similar in those reports. Rather, the reports include statements from legislators and advocates regarding the importance of protecting privacy even as technology changes . . . If anything, the text, purpose, and history of the statute suggest that Congress intended the meaning of PII to be expansive so that it could adapt to changing technology.

*Manza*, 2025 WL 1445762, at *6-7.

Third, *Solomon* was incorrectly decided because its holding relied heavily on post-enactment legislative history, which the Supreme Court has cautioned against for nearly a century. *See United States v. Price*, 361 U.S. 304, 313 (1960) ("Moreover, the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one."); *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 354 (1977) ("The views of members of a later Congress, concerning different sections of Title VII, enacted after this litigation was commenced, are entitled to little if any weight. It is the intent of the Congress that enacted s 703(h) in 1964, unmistakable in this case, that controls."); *Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) ("It is a particularly dangerous ground on which to rest an interpretation of a prior

statute[.]"); *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 670 (2020) ("All we can know for certain is that speculation about why a later Congress declined to adopt new legislation offers a 'particularly dangerous' basis on which to rest an interpretation of an existing law a different and earlier Congress did adopt."); *see e.g., United States v. United Mine Workers of Am.*, 330 U.S. 258, 282 (1947) ("We fail to see how the remarks of these Senators in 1943 can serve to change the legislative intent of Congress expressed in 1932[.]").

Fourth, *Solomon* is not binding on this Court as a Second Circuit decision, and this Court should follow its well-established precedent. *See DaimlerChrysler Corp. Healthcare Benefits Plan v. Durden,* 448 F.3d 918, 923 (6th Cir. 2006). This Court should reject *Solomon*'s overly restrictive approach, follow the overwhelming majority of district courts, and deny Defendant's Motion. *See Golden*, 688 F. Supp. 3d at 159.

### III.     The FAC Adequately Alleges that Defendant Acted Knowingly

Finally, Defendant argues that the FAC fails to adequately allege facts showing that Defendant acted in a "knowing" manner, mirroring the reasons the district court in *In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1092 (N.D. Cal. 2015) articulated for granting summary judgment. (*See* Doc. 17, Mot., at PageIDs 169-171). Even disregarding that *Hulu* was in a more developed procedural posture than this case, Defendant's argument is baseless.

The FAC contains myriad allegations demonstrating that Defendant knowingly disclosed Plaintiff's and all of its other consumers' personally identifiable information to Meta by installing the Meta Pixel on its website to improve its marketing and advertising abilities. Specifically, the Complaint alleges that "Defendant knowingly disclosed Plaintiff's and Class members' Private Viewing Information to Meta via the Meta Pixel technology because Defendant intentionally installed and programmed the Meta Pixel code on its Websites, **knowing that such code would transmit that total access to a video service was purchased and later the titles of the specific**

prerecorded videos requested or obtained using that service, which were disclosed each alongside the consumers' unique identifiers (including FIDs and device information)." (Doc. 16, FAC, ¶ 93, at PageID 151 (emphasis added)). The FAC bolsters these allegations with the following allegations:

- "Plaintiff brings this action to redress Defendant Continued.com, LLC's ("Continued") practices of **knowingly disclosing Plaintiff's and its other customers' identities, their purchases of a specific video service that grants them access to prerecorded video content, and the specific titles of prerecorded videos requested or obtained to Meta** . . . ." (Doc. 16, FAC, ¶ 1, at PageID 122) (emphasis added)

- "[T]he Meta Pixel technology that Defendant **intentionally installed** on its Websites transmits (1) the consumer's FID, (2) the specific title of the video service, (3) the specific title of the videos requested or obtained using that package, and (4) the URL where the video service is available for purchase or the specific prerecorded videos are available for viewing . . . ." (*Id.*, ¶ 54, at PageID 139 (emphasis added)).

- "Defendant **intentionally programmed its websites (by following step-by-step instructions from Meta's website) to include the Meta Pixel** that systematically transmits to Meta the FIDs of its purchasers and subscribers, the title of the video service, the titles of the videos requested or obtained, and the URL where the video service and videos are available in order to take advantage of the targeted advertising and other informational and analytical services offered by Meta." (*Id.*, ¶ 75, at PageID 144).

- "With only a person's FID and the knowledge that a person purchased a total access video service on Defendant's website—**all of which Defendant knowingly provides to Meta**. . . . However, **Defendant's configuration of the Meta Pixel goes further and discloses the titles of the specific videos requested or obtained by a subscriber after the total access video service is purchased**. Thus, Defendant's disclosure informs any ordinary person of a consumer's (1) FID, (2) their purchase of a total access subscription to Defendant's video service (including the URL where it is available for purchase), (3) the specific videos requested or obtained using that video service (including the URL where each video is available for viewing)" (*Id.*, ¶ 76, at PageID 144-145 (emphasis added)).

- "At all relevant times, Defendant **knew that the Meta Pixel was disclosing its subscribers' Private Viewing Information to Meta**." (*Id.*, ¶ 78, at PageID 146 (emphasis added)).[5]

---

[5] The FAC defines "Private Video Information" as "information that reveals a particular person purchased a subscription to access prerecorded video content on Defendant's Websites." (Doc. 1 at ¶ 3).

- "Defendant could easily have programmed its websites so that none of its subscribers' detailed Private Viewing Information is disclosed to Meta. Instead, **Defendant chose to program its websites so that all of its subscribers' detailed Private Video Information is sent to Meta en masse**" (*Id.*, 79, at PageID 146 (emphasis added)).

Any one of these well-pleaded allegations, standing alone, would be sufficient to allege Defendant's knowing disclosure of Plaintiff's personally identifiable information to Meta. *See Czarnionka v. Epoch Times Ass'n, Inc.*, No. 22 CIV. 6348 (AKH), 2022 WL 17069810, at *3 (S.D.N.Y. Nov. 17, 2022); *Frawley v. Nexstar Media Grp. Inc.*, No. 3:23-CV-2197-L, 2024 WL 3798073, at *9 (N.D. Tex. July 22, 2024); *Feldman*, 659 F. Supp. 3d at 1022; *Harris*, 662 F. Supp. 3d at 1336. Taken together, they paint a clear picture of Defendant's intentional effort to improve its marketing capabilities by knowingly installing and utilizing the Meta Pixel to systematically disclose all of its subscribers' personally identifiable information to Meta. *See e.g., Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 457 (6th Cir. 2011) (finding allegations sufficient where the complaint offers direct allegations of the claim supported by instances to support those allegations).

Indeed, Chief Magistrate Judge Litkovitz recently observed that "[m]ost cases that have considered similar claims have determined allegations such as those made in the complaint at bar are sufficient to state a VPPA claim." *See Haines*, No. 1:24-cv-710, ECF No. 18, at PageID 167-68 (collecting cases where the "knowing" element was satisfied at the pleading stage). Plaintiff respectfully incorporates all cases cited by Judge Litkovitz as if listed herein. Defendant has not and cannot demonstrate a single case where a motion to dismiss was granted based on the "knowing" element of a VPPA claim. For good reason. Defendant's Motion should be denied.

## CONCLUSION

For the reasons stated herein, the Motion should be denied.

Respectfully submitted,

**O'CONNOR, HASELEY AND WILHELM, LLC**

Dated: July 18, 2025

/s/ Daniel J. O'Connor
Ohio Supreme Court No. 0091397
O'CONNOR, HASELEY AND WILHELM, LLC
470 West Broad Street, Suite 15,
Columbus, OH 43215
Telephone: (614)246-8840
doconnor@goconnorlaw.com

*and*

**HEDIN LLP**

Elliot O. Jackson, *pro hac vice*
Florida Bar No. 1034536
HEDIN LLP
1395 Brickell Ave., Suite 610
Miami, Florida 33131-3302
Telephone:     (305) 357-2107
Facsimile:      (305) 200-8801
ejackson@hedinllp.com

*Counsel for Plaintiff and Putative Class*

20

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 24-cv-61983-WPD

CATHERINE KUEPPERS
and KATHLEEN SUMMY,
individually and on behalf of
all others similarly situated,

        Plaintiffs,

v.

ZUMBA FITNESS, LLC,

        Defendant.

_____/

## <u>ORDER DENYING DEFENDANT'S MOTION TO DISMISS</u>

THIS CAUSE is before the Court on Defendant Zumba Fitness, LLC ("Defendant" or "Zumba")'s Motion to Dismiss Plaintiff's Putative Class Action Complaint, filed herein on January 13, 2025. [DE 12]. The Court has reviewed the Motion [DE 12], the Response, filed on February 26, 2025 [DE 15], the Reply, filed March 19, 2025 [DE 20], and the arguments during the Friday, May 2, 2025 hearing and is otherwise fully advised in the premises.

### I.      Background

Catherine Kueppers and Kathleen Summy, on behalf of a putative class, ("Plaintiffs") filed this lawsuit against Zumba seeking damages and injunctive relief under the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710 and alleging the following. Defendant operates the Website www.zumba.com, which offers for sale access to various prerecorded videos concerning Defendant's trademarked dance-oriented workout program. Compl. ¶ 30. Defendant has systematically transmitted and continues to transmit its customers' personally identifying video

1

viewing information to Facebook and Pinterest using snippets of code called tracking pixels. *Id.* ¶¶ 3–4. Defendant's tracking pixels capture information the specific video materials that a particular person requested or obtained on Zumba.com. *Id.* ¶ 4. The pixels transmit this information to third parties, including Facebook and Pinterest. *Id.* Zumba does not request or obtain its customers' consent prior to disclosing its customers' private video information. *Id.* ¶ 5.

Plaintiffs Kueppers and Summy purchased a Zumba Instructor Training Course from Defendant's Website. *Id.* ¶¶ 10, 20. The Course included prerecorded video materials. *Id.* Kueppers and Summy provided their name, email address, and home address in association with the purchase of these materials. *Id.* ¶¶ 11, 21. Kueppers and Summy watched these prerecorded videos while logged into Facebook during the last two years. *Id.* ¶¶ 14, 24. When Kueppers and Summy purchased access to prerecorded videos from Defendant, Defendant disclosed to Meta their FIDs coupled with URLs identifying the prerecorded video materials they purchased, among other information about Plaintiff and the device she used to make the purchase. *Id.* ¶¶ 15, 25. Kueppers and Summy never consented, agreed, authorized, or otherwise permitted Defendant to disclose their Private Video Information to Meta. *Id.* ¶¶ 16, 27.

## II.   Standard of Law

To adequately plead a claim for relief, Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief," to "give fair notice of what the . . . claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). Under Rule 12(b)(6), a motion to dismiss should be granted only if the plaintiff is unable to articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (*abrogating Conley*, 355 U.S. at 41). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is

2

liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). The allegations of the claim must be taken as true and must be read to include any theory on which the plaintiff may recover. *See Linder v. Portocarrero*, 963 F. 2d 332, 334–36 (11th Cir. 1992) (citing *Robertson v. Johnston*, 376 F. 2d 43 (5th Cir. 1967)).

Nevertheless, the Court need not take allegations as true if they are merely "threadbare recitals of a cause of action's elements, supported by mere conclusory statements . . ." *Iqbal*, 556 U.S. at 663. In sum, "a district court weighing a motion to dismiss asks 'not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" Twombly, 550 U.S. at n. 8 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds, Davis v. Scherer*, 468 U.S. 183 (1984)).

## III.    Discussion

Congress passed the Video Privacy Protection Act ("VPPA") in 1988 "after the *Washington City Paper* published Supreme Court nominee Robert Bork's video rental history." *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 278 (3d Cir. 2016) (internal quotations omitted). "The paper had obtained (without Judge Bork's knowledge or consent) a list of the 146 films that the Bork family had rented from a Washington, D.C.-area video store." *Id.* Congress's intent in passing the VPPA was "[t]o preserve personal privacy with respect to the rental, purchase or delivery of video tapes or similar audio visual materials." S. Rep. No. 100-599, at 1 (1988), reprinted in 1988 U.S.C.C.A.N. 4342-1.

In 2012, Congress amended the VPPA "to reflect the realities of the 21st century." 158 Cong. Rec. H6849–01 (Dec. 18, 2012); *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1253 (11th Cir. 2015). Courts seem to agree the Act has not "become a dead letter with the demise of the

corner video store." *Nickelodeon*, 827 F.3d at 285–86. Indeed, courts have held that websites qualify as "a video tape service provider within the VPPA." *See Golden v. NBCUniversal Media, LLC*, 688 F. Supp. 3d 150, 157 (S.D.N.Y. 2023).

The VPPA provides, "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person for the relief provided in subsection (d)." 18 U.S.C. § 2710. In turn, "the term 'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710 (a)(3). Thus, to state a claim under the VPPA, a plaintiff must allege facts showing the defendant "actually knew it was disclosing: (1) a user's identity; (2) the identity of the video material; and (3) the connection between the two—i.e., that the given user had 'requested or obtained' the given video material." *In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1095 (N.D. Cal. 2015).

Defendant seeks dismissal of the single-count Complaint in its entirety. First, Defendant argues Plaintiffs fail to plausibly allege a disclosure of any "personally identifying information" by Zumba because (a) Plaintiffs failed to allege Zumba disclosed PII connecting Plaintiffs to any specific video materials, and (b) Plaintiffs failed to plausibly allege the disclosure of the PII would permit an ordinary person to identify a particular person's video-watching habits. Second, Plaintiffs fail to plausibly allege Zumba knowingly disclosed Plaintiffs' personally identifying information to any third Party. The Court addresses each argument, in turn.

4

1.  *Personally Identifiable Information*

Again: "the term 'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710 (a)(3). The Court finds the Complaint sufficiently alleges Defendant disclosed personally identifiable information within the meaning of the statute.

a.  *"Specific Video Materials"*

First, Defendant argues no disclosure was made because Defendant did not disclose information connecting plaintiffs to specific video materials—to wit, the *video titles*. Plaintiffs only allege Defendant disclosed the URL to a webpage containing the name of the training course.

The Eleventh Circuit has expressly declined to comment on what qualifies as "specific video materials." *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1252 (11th Cir. 2015) ("we leave for another day the contours of the term 'personally identifiable information.'"). But most other courts to address the issue have found that the disclosure of a URL webpage containing a video qualifies as disclosure of "specific video materials" within the meaning of the statute.  In *Golden*, Judge Engelmayer of the Southern District of New York wrote:

> Insofar as the statutory definition of PII includes that the identified person "requested or obtained *specific video materials* or services," 18 U.S.C. § 2710(a)(3), the FAC also adequately alleges that Today.com disclosed "specific video materials"—to wit, each video's URL and name.

688 F. Supp. 3d at 160. Many district courts to consider the question have arrived at the same or similar conclusions. *See, e.g.*, *Harris v. Pub. Broad. Serv.,* 662 F.Supp.3d 1327, 1334–1335 (N.D. Ga. 2023)  (PII alleged where complaint alleged that Facebook ID, URL address, and webpage title only were disclosed); *Feldman v. Star Tribune Media Company*, 659 F.Supp.3d 1006, 1020– 21 (D. Minn. 2023) ("connecting a Facebook ID to a specific person, a URL to a particular video,

and the specific person to the particular video is a reasonably straightforward exercise" and "electronic disclosures of a person's video-viewing history, even if not explicit, can violate the VPPA"); *Frawley v. Nexstar Media Grp. Inc.*, No. 3:23-CV-2197-L, 2024 WL 3798073, at *3 (N.D. Tex. July 22, 2024*), report and recommendation adopted*, No. 3:23-CV-2197-L, 2024 WL 3807700 (N.D. Tex. Aug. 13, 2024) ("Plaintiff is not required to allege the specific videos he watched to state a claim under the VPPA"); *Ambrose v. Boston Globe Media Partners LLC*, No. 21-cv-10810-RGS, 2022 WL 4329373, at *1 (D. Mass. Sept. 19, 2022) (disclosure of the webpage visited via the Facebook tracking pixel stated a claim); *Czarnionka v. The Epoch Times Ass'n, Inc.*, No. 22 Civ. 6348 (AKH), 2022 WL 17069810, at *1 (S.D.N.Y. 2022) (same); *cf. Sellers v. Bleacher Rep., Inc.*, No. 23-CV-00368-SI, 2023 WL 4850180, at *1 (N.D. Cal. 2023) (same, where complaint made general allegation that Facebook pixel disclosed name of viewed video).

These cases are directly on point and the Court agrees with their reasoning. Thus, in the absence of binding precedent on the issue, the Court joins these district courts in finding that a plaintiff bringing a VPPA claim need not allege that the specific video titles were disclosed; rather, allegations that defendant disclosed a URL to a webpage containing the video that plaintiff obtained is sufficient.

Here, Plaintiffs sufficiently allege Defendant disclosed URLs containing videos obtained by Plaintiffs when they alleged, among other facts, that:

> 102. When the purchase of an on-demand video instructor course is complete, the customer is routed to a new webpage (also hosted on Defendant's Website). This page says "YOU'RE ALL SET." It also prominently displays: (1) the name of the individual who purchased the on-demand video materials and (2) the name of the specific video materials that the person purchased.
>
> 103. The "YOU'RE ALL SET" pages also have the Meta Pixel installed. Defendant uses the Meta Pixel to transmit the URLs of these webpages, along with the FIDs

of the individuals who purchased the on-demand video materials and hwo [sic] are named on each page, to Meta. Compl. ¶¶ 102–03. Defendant's contention that the allegation that Defendant disclosed the "training course" purchased (containing multiple "modules"), rather than the specific videos within the course, is of no moment for the purpose of the VPPA. Defendant doesn't argue that this training course doesn't contain *any* videos, only that it does not *exclusively* contain videos.

Defendant argues the courts in *In re Hulu Priv. Litig.*, No. C 11–03764 LB, 2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) and *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262 (3d Cir. 2016) impose a requirement that Plaintiff must allege the disclosure of specific video titles to state a claim under the VPPA. But *Hulu* and *Nickelodeon* do not directly address whether disclosure of the video *title* is required to state a claim under the VPPA. Those cases only state that "the statute protects personally identifiable information that identifies a specific person and ties that person to particular videos that the person watched." *Nickelodeon*, 827 F.3d at 284–85 (citing *Hulu*, 2014 WL 1724344, at *8).[1] This sentiment merely echoes the plain text of the statute but makes no finding as to what qualifies as "specific video materials." Conversely, the courts to directly considered the issue (above) found that there is no technical requirement that the name of the video and not a URL link to the video page must be disclosed.[2]

Accordingly, the Court denies Defendant's motion in part on this basis.

---

[1] As it happens, in *Hulu*, the video titles were alleged. But the court made no issue of this fact, nor commented that such a finding was necessary to deny Hulu's summary judgment motion.

[2] Defendant also argues that *Martin v. Meredith Corporation*, is instructive. 657 F.Supp.3d 277 (S.D.N.Y. 2023). There, the court dismissed plaintiff's complaint, concluding that "disclosing to a third party the title of the webpage does not reveal the title of a video on the page, let alone whether the website visitor requested or obtained the video instead of merely reviewing an article on the page" and, so, dismissed the plaintiff's complaint for failure to state a claim under the VPPA. *Id.* at 284–85. This case appears to be an outlier, and we agree with the majority of courts that have held to the contrary.

b. "Ordinary Person"

Defendant asks this Court to read the VPPA as requiring that not only Meta and Pinterest, but that any "ordinary person" must have been able to link the consumer with the video. Plaintiffs argue the VPPA contains no requirement that an "ordinary person" must be able to identify Zumba's customer. Instead, Plaintiffs urge this Court to read the VPPA as requiring allegations that *Meta* and *Pinterest* tie the videos to the individuals.

The Ninth Circuit requires not only that the receiving party, but that *any ordinary person*, be able to identify the individual video consumer based upon the information disclosed, usually a numerical ID of some kind. *See Eichenberger v. ESPN*, 876 F.3d 979, 985 (9th Cir. 2017) ("The 'ordinary person' test better informs video service providers of their obligations under the VPPA."). The Third Circuit arguably[3] requires the same. *See Nickelodeon*, 827 F.3d at 267 ("[w]e [] hold that the Act's prohibition on the disclosure of personally identifiable information applies only to the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching behavior.").

Conversely, the First Circuit held the term "personally identifiable information" encompasses "information reasonably and foreseeably likely to reveal which. . . videos [a person] has obtained." *Yershov v. Gannett Satellite Info. Network, Inc*., 820 F.3d 482, 486 (1st Cir. 2016)

---

[3] There is evidence from the *Nickelodeon* opinion that the Third Circuit didn't specifically raise the standard for *who* needed to be able to tie the disclosure to an individual person. Instead, the court's holding seems to be about the ease with which *one* could draw the connection between the numerical identifier disclosed and the individual video consumer. *See Nickelodeon*, 827 F.3d at 284 ("Our review of the legislative history convinces us that Congress's purpose in passing the Video Privacy Protection Act was quite narrow: to prevent disclosures of information that would, with little or no extra effort, permit an *ordinary recipient* to identify a particular person's video-watching habits.") (emphasis added). This "ordinary recipient" language suggests that its holding applies to any recipient, not an "ordinary person" in the legal sense of the term.

(emphasis added). Under this lighter standard, liability attaches if the *intended recipient* can connect the numerical ID to the individual. Thus, "[r]evealing a person's social security number *to the government*, for example, plainly identifies the person. Similarly, when a football referee announces a violation by 'No. 12 on the offense,' *everyone with a game program* knows the name of the player who was flagged." *Yershov*, 820 F.3d at 486 (emphases added) (finding Plaintiff sufficiently alleged disclosure of personally identifying information where Plaintiff alleged disclosure of GPS coordinates to Adobe, which possessed the "game program… allowing it to link the GPS address and device identifier to a certain person by name, address phone number, and more.").

District courts have similarly found that, so long as plaintiff alleges the receiving party can easily ascertain the individual's identity from the disclosed information, plaintiff may state a claim. *See also, e.g.*, *Hulu*, 2014 WL 1724344, at *11 ("if an anonymous, unique ID were *disclosed to a person who could understand it, that might constitute PII*.") (emphasis added); *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 183 (S.D.N.Y. 2015) (allegations of a "correlated look-up table" that would "enable Adobe to link the hashed serial number of [the plaintiff's] Roku device and his viewing choices to his identity" would satisfy the personally identifiable information pleading standard.).

The Eleventh Circuit has yet to adopt any standard.

In the absence of binding precedent, Court finds ample support from case law and from the statute itself for the proposition that, so long as the *person or entity receiving the disclosure* could reasonably and foreseeably identify which videos a person has obtained, Plaintiff sufficiently alleges a violation of the statute. *See Yershov*, 820 F.3d at 486. Here, the Complaint alleges Defendant intentionally installed the Meta Pixel which transmitted to Meta Plaintiffs' Facebook

IDs in conjunction with the URL link to the training course purchased. And certainly, (contrary to Defendant's ancillary point), "Meta can easily 'link' the FID to a specific user." *Li v. Georges Media Grp. LLC,* No. CV 23-1117, 2023 WL 7280519, *4 (E.D. La. Nov. 3, 2023); *see also* Compl. ¶ 51 (quoting Meta's developer guide as stating that "a Meta Pixel installed on a company's website allows Meta to 'match [] website visitors to their respective Facebook User accounts.'").

In the alternative, Plaintiffs argue that, to the extent there *is* an ordinary person requirement, Plaintiff *has* alleged an ordinary person could tie the videos to the consumers. The Court agrees. *See Martinez v. D2C, LLC*, No. 23-21394-CIV, 2023 WL 6587308, at *4 (S.D. Fla. Oct. 10, 2023) (assuming without deciding the ordinary person standard applied, but finding Plaintiff nonetheless stated a claim where it alleged the Facebook ID was disclosed because "[t]he [Facebook ID] is a unique identifier that is enough, on its own, to identify a person.") (quoting *Sellers*, 2023 WL 4850180 at *4).

Defendant also argues that, as to the Pinterest claims specifically, the cookie does not constitute PII under the VPPA because it is encrypted. Plaintiffs allege that a Pinterest user's first and last name, age, gender, email address, country, region, and preferred language are directly linked to a persons s_a encrypted value, thereby purportedly allowing Pinterest to identify one particular person per s_a cookie. Defendant argues that because this encrypted cookie could not be read by an ordinary person, it therefore was not PII.

In the first instance, Defendant cites no precedent to suggest that an encrypted cookie is somehow to be treated differently than any other transmission. Defendant's cited case, *Bernadino v. Barnes & Noble Booksellers, Inc*., does not even mention encryption. No. 17-CV-04570 (LAK) (KHP), 2017 WL 3727230, at *8 (S.D. N.Y. Aug, 11, 2017), *report and recommendation adopted*, No. 17-CV-4570 (LAK), 2017 WL 3726050 (S.D. N.Y. Aug. 28, 2017). Second, as discussed

10

above, this Court declines to adopt the ordinary person standard. It suffices to allege—at this stage—that *Pinterest* would be able link the user to the video they obtained via the encrypted cookie. This Plaintiff has done.

### 2. Knowingly Disclosed

Defendant lastly argues that because Zumba never personally possessed or had access to Plaintiffs' Facebook IDs/Pinterest user IDs, it cannot be liable for allegedly transmitting those Facebook IDs/Pinterest IDs to anyone—let alone knowingly transmitting. In turn, Plaintiffs argue their allegations that Defendant intentionally installed the Meta Pixel on its site for the express purpose of obtaining users' Facebook IDs is sufficient.

The Court agrees with Plaintiff. Plaintiff has pled that "Defendant *knowingly disclosed* Plaintiffs' and Class members' Private Viewing Information to Meta via the Meta Pixel technology because Defendant intentionally installed and programmed the Meta Pixel code on its Website, knowing that such code would transmit to Meta the titles of the video materials purchased by its customers coupled with its customers' unique identifiers (including [Facebook IDs])." Compl. ¶ 141 (emphasis added). We agree that "defendant's installation of pixel on its website prevents defendant from claiming transmission of information occurs independent of its action." *Czarnionka*, 2022 WL 17069810 at *3. "That the pixel [] requires Plaintiff to be logged into Facebook does not take away from Defendant's role in the transmission. . . At most, it makes Defendant's alleged actions a cause that requires some pre-existing condition; but a cause, nonetheless." *Harris*, 662 F. Supp. 3d at 1334–35. Plaintiff is not required to prove scienter at the motion to dismiss stage. These allegations suffice.

## IV. Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1. The Motion [DE 12] is hereby **DENIED**;

2. Defendant shall file an answer to the Complaint by May 19, 2025.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Florida, this 6th day of May, 2025.

WILLIAM P. DIMITROULEAS
United States District Judge

Copies to:

Counsel of Record