## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## CINCINNATI DIVISION

| | |
|---|---|
| ALEXANDRIA HAINES, individually and on behalf of all others similarly situated,<br><br>                Plaintiff,<br>   v.<br><br>CENGAGE LEARNING, INC.,<br><br>               Defendant. | Case No. 1:24-cv-00710-MWM<br><br>**CLASS ACTION**<br><br>**(JURY TRIAL DEMANDED)** |

### FIRST AMENDED CLASS ACTION COMPLAINT[1]

Plaintiff Alexandria Haines, individually and on behalf of all others similarly situated, makes the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to allegations pertaining specifically to herself or her counsel, which are based on personal knowledge.

### NATURE OF THE CASE

1.      Plaintiff brings this action to redress Defendant Cengage Learning, Inc.'s ("Cengage") practices of disclosing to third parties records containing information that reveals the specific titles of the prerecorded videos or subscriptions to access prerecorded videos that particular persons purchased (or otherwise requested or obtained) on Defendant's network of websites (hereinafter, "Private Video Information"), in violation of the Video Privacy Protection Act, 18 U.S.C. § 2710 *et seq.* ("VPPA").

2.      Over the two years preceding the initiation of this action, Defendant has systematically transmitted its customers' Private Video Information to third parties, including

---

[1]      Plaintiff files this First Amended Class Action Complaint with Defendant's written consent pursuant to Federal Rule of Civil Procedure 15(a)(2).

Meta Platforms, Inc. ("Meta") and LinkedIn Corporation ("LinkedIn"), by way of snippets of programming code (collectively referred to herein as the "Tracking Technologies") installed on the websites www.ed2go.com, www.miladytraining.com, www.eltngl.com, www.ngl.cengage.com, www.infosecinstitute.com, www.gale.com, and www.cengage.com (collectively the "Websites"), all of which Defendant owns, operates, controls, and oversees in the same or materially the same manner.[2]

3.     The Tracking Technology that Defendant installed on the Websites and has used to transmit its customers' Private Video Information to Meta is called the "Meta Pixel," and the Tracking Technology that Defendant installed on the Websites and has used to transmit its customers' Private Video Information to LinkedIn is called the "Insight Tag". The Tracking Technologies operate in the same or materially the same manner on each of the Websites on which they have been installed.

4.     The Private Video Information that Defendant disclosed to Meta via the Meta Pixel includes the customer's Facebook ID ("FID") and the specific title of the prerecorded video or subscription to access prerecorded videos that the customer purchased (or otherwise requested or obtained) on one of its Websites. An FID is a unique sequence of numbers linked to a specific Meta profile.  A Meta profile, in turn, identifies by name the specific person to whom the profile belongs (and also contains other personally identifiable information about the person).  Entering "Facebook.com/[FID]" into a web browser returns the Meta profile of the person to whom the FID corresponds.  Thus, the FID identifies a person more precisely than a name, as numerous persons

---

[2]     Since the filing of this Action, Defendant has made significant changes to its Websites, including but not limited to by modifying or removing the Meta Pixel on www.infosecinstitute.com and www.cengage.com and the Insight Tag on www.miladytraining.com.

may share the same name, but each person's Facebook profile (and associated FID) uniquely identifies one and only one person. In the simplest terms, the Meta Pixel installed by Defendant on its Websites systematically discloses its customers' Private Video Information to Meta.

5. The Private Video Information that Defendant disclosed to LinkedIn via the Insight Tag includes the customer's email address and device identifiers (including stored cookies) and the specific title of the prerecorded video or subscription to access prerecorded videos that the customer purchased (or otherwise requested or obtained) on one of its Websites. An email address is used by and corresponds to the name of a single person—the account holder—and is thus capable of identifying the person to whom the email addresses belong. Additionally, an email address and a first and last name are required to create a LinkedIn profile. Thus, a person's LinkedIn profile, to which the person's email address is linked, identifies by full name the person to whom the profile (and email address) corresponds (and also contains other personally identifiable information about the person). In the simplest terms, the Insight Tag installed by Defendant on its Websites systematically discloses its customers' Private Video Information to LinkedIn.

6. Defendant disclosed its customers' Private Video Information to Meta and LinkedIn without asking for, let alone obtaining, any of its customers' consent to these practices.

7. The VPPA clearly prohibits what Defendant has done. Subsection (b)(1) of the VPPA provides that, absent the consumer's prior informed, written consent, any "video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person for," 18 U.S.C. § 2710(b)(1), damages in the amount of $2,500.00, *see id.* § 2710(c).

8. Accordingly, on behalf of herself and the putative Class members defined below, Plaintiff files this First Amended Class Action Complaint against Defendant for knowingly

3

disclosing her and putative Class (defined below) members' Private Video Information to third parties in violation of the VPPA.

**PARTIES**

**I.      Plaintiff Alexandria Haines**

9.      Plaintiff is, and at all times relevant hereto was, a citizen and resident of Pierce County, Washington.

10.      Plaintiff is, and at all times relevant hereto was, a user of Meta and LinkedIn.

11.      Plaintiff is a consumer of the prerecorded videos or subscriptions to access prerecorded videos offered on Defendant's www.ed2go.com website. Including on or about March 9, 2023, Plaintiff purchased prerecorded videos or subscriptions to access prerecorded videos from Defendant's ed2go.com website by requesting and paying for such materials or services, and by providing her name, email address, and home address.  Defendant then provided Plaintiff the prerecorded videos or subscriptions to access prerecorded videos that she had purchased. Accordingly, Plaintiff requested or obtained, and is therefore a consumer of, the prerecorded videos or subscriptions to access prerecorded videos sold by Defendant on its website.

12.      At all times relevant hereto, including when purchasing (and when otherwise requesting or obtaining) prerecorded videos or subscriptions to access prerecorded videos on Defendant's www.ed2go.com website and when viewing such videos on Defendant's www.ed2go.com website following her purchase, Plaintiff had a Meta account, a Meta profile, and an FID associated with such profile, as well as a LinkedIn account, a LinkedIn profile, and an email address that was associated with such profile and used to complete her purchase

13.      Plaintiff has never consented, agreed, authorized, or otherwise permitted Defendant to disclose her Private Video Information to Meta, LinkedIn, or anyone else. In fact, Defendant

4

has never even adequately notified Plaintiff of its practices of disclosing its customers' Private Video Information to third parties such as Meta or LinkedIn.

14.     Nevertheless, whenever Plaintiff purchased (or otherwise requested or obtained) prerecorded videos or subscriptions to access prerecorded videos offered on Defendant's www.ed2go.com website, including on or about March 9, 2023, Defendant transmitted, via the Tracking Technologies known as the Meta Pixel and Insight Tag that it had installed on its Websites, Plaintiff's Private Video Information to Meta and LinkedIn.

15.     By way of example to illustrate Defendant's disclosures of Plaintiff's Private Video Information to Meta, when Plaintiff purchased (or otherwise requested or obtained, such as by "adding to cart") a subscription to the "Medical Billing and Coding" prerecorded video course offered on Defendant's www.ed2go.com website, the specific title or URL (containing the title) of the subscription Plaintiff had purchased (or otherwise requested or obtained) to access prerecorded video material, as well as her request to "ENROLL NOW" to complete her purchase, was transmitted to Meta alongside Plaintiff's FID – as depicted in the screenshot below (reflecting a transmission to Meta of such data from one of Defendant's Websites, captured during the pre-suit investigation by Plaintiff's counsel into this matter and representative of what Plaintiff experienced):

| Request URL: | https://www.facebook.com/privacy_sandbox/pixel/register/trigger/?id=1437036116561317&ev=SubscribedButtonClick&dl=https%3A%2F%2Fwww.ed2go.com%2Fcourses%2Fhealth-and-fitness%2Fmedical%2Fctp%2Fmedical-billing-coding-voucher-included&rl=https%3A%2F%2Fwww.ed2go.com%2Fsearch%3Fterm%3Dmedical%2Bcoding%26courseTypes%3Dadvanced-career-training&if=false&ts=1729792198301&cd[buttonFeatures]=%7B%22classList%22%3A%22font-weight-bold%20px-5%20text-uppercase%20btn%20btn-success%22%2C%22destination%22%3A%22https%3A%2F%2Fwww.ed2go.com%2Fenrollment%2Faddtocart.aspx%3Fitem%3DGES1014!pierce-wa%22%2C%22id%22%3A%22checked-enrollment-btn%22%2C%22imageUrl%22%3A%22%22%2C%22innerText%22%3A%22ENROLL%20NOW%22%2C%22numChildButtons%22%3A0%2C%22tag%22%3A%22a%22%2C%22type%22%3Anull%2C%22name%22%3A%22%22%7D&cd[buttonText]=ENROLL%20NOW&cd[formFeatures]=%5B%5D&cd[pageFeatures]=%7B%22title%22%3A%22Medical%20Billing%20and%20Coding%20(Voucher%20Included)%22%7D&cd[parameters]=%5B%5D&sw=3008&sh=1692&v=2.9.174&r=stable&a=tmgoogletagmanager&ec=2&o=4126&fbp=fb.1.1729722869661.3760836688358397 9&cs_est=true&ler=empty&cdl=API_unavailable&it=1729792195650&coo=false&es=automatic&tm=3&rqm=FGET |
|---|---|
| Request Method: | GET |
| Status Code: | 🟢 200 OK |
| Remote Address: | 31.13.67.35:443 |
| Referrer Policy: | strict-origin-when-cross-origin |

16.     Defendant's disclosure of Plaintiff's Private Video Information to LinkedIn was analogous to the disclosure of her Private Video Information to Meta in that, in the course of making her purchase on Defendant's www.ed2go.com website on March 9, 2023, the Insight Tag that Defendant had installed on the website disclosed to LinkedIn, *inter alia*, Plaintiff's email address (along with other device identifiers (including her stored cookies) that were associated with and capable of identifying her LinkedIn profile, on which her name and other personal and contact details appeared) together with specific specific title of the prerecorded video or

subscription to access prerecorded videos that Plaintiff had purchased or otherwise requested or obtained (in the form of the URL that identified by name such material or service).

17.     Prior to and at the time Plaintiff purchased (or otherwise requested or obtained) prerecorded videos or subscriptions to access prerecorded videos from Defendant, Defendant did not notify Plaintiff that it would disclose the Private Video Information of its customers generally or that of Plaintiff in particular, and Plaintiff has never consented, agreed, authorized, or otherwise permitted Defendant to disclose her Private Video Information to Meta, LinkedIn, or any other third party.  Plaintiff has never even been adequately provided written notice that Defendant discloses its customers' Private Video Information, or any means of opting out of such disclosures.

18.     By disclosing Plaintiff's Private Video Information to Meta and LinkedIn during the applicable statutory period, Defendant violated Plaintiff's rights under the VPPA and invaded her statutorily conferred interest in keeping such information (which bears on her personal affairs and concerns) private.

## II.     Defendant Cengage Learning, Inc.

19.     Defendant is an educational technology company that owns, operates, controls, and oversees a network of websites – www.ed2go.com, www.miladytraining.com, www.eltngl.com, www.ngl.cengage.com, infosecinstitute.com, www.gale.com, and www.cengage.com – where it sells a wide range of prerecorded educational videos and subscriptions to access prerecorded educational videos to consumers nationwide.  Defendant is incorporated under the laws of the State of Delaware and maintains its principal place of business in Mason, Ohio.

## JURISDICTION AND VENUE

20.     The Court has subject-matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 2710.

21.     Personal jurisdiction and venue are proper because Defendant maintains its headquarters and principal place of business in Mason, Ohio, which is within this judicial District.

## VIDEO PRIVACY PROTECTION ACT

22.     The VPPA prohibits companies (like Defendant) from knowingly disclosing to third parties (like Meta and LinkedIn) personally identifiable information that reveals the specific video materials or services (such as subscription to access prerecorded videos) requested or obtained by particular consumers (like Plaintiff).

23.     Specifically, subject to certain exceptions that do not apply here, the VPPA prohibits "a video tape service provider" from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider[.]" 18 U.S.C. § 2710(b)(1). The statute defines a "video tape service provider" as "any person, engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4).  It defines a "consumer" as "a renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). "'[P]ersonally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

24.     Leading up to the VPPA's enactment in 1988, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." *Id.*   Senators at the time were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audiovisual materials because such records offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and

pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

25.     Thus, in proposing the Video and Library Privacy Protection Act (which later became the VPPA), Senator Patrick J. Leahy (the senior Senator from Vermont from 1975 to 2023) sought to codify, as a matter of law, that "our right to privacy protects the choice of movies that we watch with our family in our own homes." 134 Cong. Rec. S5399 (May 10, 1988).   As Senator Leahy explained at the time, the personal nature of such information, and the need to protect it from disclosure, is the raison d'être of the statute: "These activities are at the core of any definition of personhood.  They reveal our likes and dislikes, our interests and our whims.  They say a great deal about our dreams and ambitions, our fears and our hopes.  They reflect our individuality, and they describe us as people." *Id*.

26.     While these statements rang true in 1988 when the act was passed, the importance of legislation like the VPPA in the modern era of data mining is more pronounced than ever before. During a more recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized the point by stating: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[3]

---

[3]     The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, http://www.judiciary. senate.gov/meetings/the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21stcentury.

27.　　Former Senator Al Franken may have said it best: "If someone wants to share what they watch, I want them to be able to do so . . . But I want to make sure that consumers have the right to easily control who finds out what they watch—and who doesn't. The Video Privacy Protection Act guarantees them that right."[4]

28.　　In this case, however, Defendant deprived Plaintiff and numerous other similarly situated persons of that right by systematically (and surreptitiously) disclosing their Private Video Information to third parties, without providing notice to (let alone obtaining consent from) any of them, as explained in detail below.

## BACKGROUND FACTS

### I.　　Consumers' Personal Information Has Real Market Value

29.　　In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[5]

30.　　Over two decades later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion per year online advertising industry in the United States.[6]

---

[4]　　Chairman Franken Holds Hearing on Updated Video Privacy Law for 21st Century, franken.senate.gov (Jan. 31, 2012).

[5]　　Transcript, *The Information Marketplace* (Mar. 13, 2001), at 8-11, available at https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf.

[6]　　*See* Julia Angwin and Emily Steel, *Web's Hot New Commodity: Privacy*, Wall Street Journal (Feb. 28, 2011), available at https://www.wsj.com/articles/SB10001424052748703529004576160764037920274.

31.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis – and profit.[7]

32.     In fact, an entire industry exists where companies known as data aggregators purchase, trade, and collect massive databases of information about consumers. Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[8]

33.     The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[9]

---

[7]     Statement of FTC Cmr. Harbour (Dec. 7, 2009), at 2, available at https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf

[8]     *See* M. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), available at http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ .

[9]     N. Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), available at https://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html#:~:text=It's%20called%20the%20Acxiom%20Corporation,to%20know%20much%2C%20much%20more.

34.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[10]

35.     Recognizing the severe threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data, stating in pertinent part:

> By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer. This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[11]

36.     Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams, including fraudulent sweepstakes, charities, and buying clubs.   Thus, when companies like Cengage share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases" of consumer data that are often "sold to thieves by large publicly traded

---

[10]     Letter from Sen. J. Rockefeller IV, Sen. Cmtee. On Commerce, Science, and Transportation, to S. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) available at https://www.commerce.senate.gov/services/files/3bb94703-5ac8-4157-a97b-%20a658c3c3061c.

[11]     *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Sen. Markey (July 24, 2012), available at https://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information.

companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[12]

37.     Defendant is not alone in violating its customers' statutory rights and jeopardizing their well-being in exchange for increased revenue: disclosing customer and subscriber information to third parties has become a widespread practice.   Unfortunately for consumers, however, this growth has come at the expense of their most basic privacy rights.

## II.    Consumers Place Monetary Value on Their Privacy and Consider Privacy Practices When Making Purchases

38.     As the data aggregation industry has grown, so has consumer concerns regarding personal information.

39.     A survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[13]   As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[14]

40.     Thus, as consumer privacy concerns grow, consumers increasingly incorporate privacy concerns and values into their purchasing decisions, and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.   In fact, consumers' personal

---

[12]     *See* Charles Duhigg, *Bilking the Elderly, with a Corporate Assist*, N.Y. Times (May 20, 2007), available at https://www.nytimes.com/2007/05/20/business/20tele.html.

[13]     *See 2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, https://www.slideshare.net/slideshow/privacidad-30859419/30859419#2.

[14]     *Id*.

information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[15]

41.    These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data.  Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[16]

42.    Thus, in today's digital economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[17]  As such, where a business offers customers a product or service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a product or service of less value than the product or service paid for.

### III.    Defendant Systematically Discloses its Customers' Private Video Information to Meta and LinkedIn

43.    Defendant sells a wide range of prerecorded educational videos and subscriptions to access prerecorded educational videos on its Websites.

44.    Defendant operates, maintains control over, and oversees all of its Websites in the same or substantially the same manner.

---

[15]    *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), available at https://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html.

[16]    *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on Monetizing Privacy* (Feb. 27, 2012), available at https://www.enisa.europa.eu/publications/monetising-privacy.

[17]    *See* Hann, et al., *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, available at https://www.comp.nus.edu.sg/~ipng/research/privacy.pdf.

45.     To purchase prerecorded video material or a subscription to access prerecorded video material from one of Defendant's Websites, a person must provide at least his or her name, email address, billing address, and credit or debit card (or other form of payment) information.

46.     As alleged below, when a person requests or obtains a prerecorded video or subscription to access prerecorded videos from Defendant's Websites, the Tracking Technologies that Defendant installed on its Websites transmit to Meta and LinkedIn, without the person's consent and in clear violation of the VPPA, the following: (1) the unencrypted FID and/or email address (along with other unique identifiers and stored cookies) corresponding to the person; and (2) detailed information that reveals the specific titles of the prerecorded videos or subscriptions to access prerecorded videos that the person requested or obtained (including a URL that reveals the specific title of the prerecorded video or subscription to access prerecorded videos that the person requested or obtained).

### A. The Meta Pixel

47.     On February 4, 2004, Mark Zuckerberg and others launched Facebook, now known as "Meta".[18] Meta is now the world's largest social media platform. To create a Meta account, a person must provide, *inter alia*, his or her first and last name, birth date, gender, and phone number or email address.

48.     The Meta Pixel, first introduced in 2013 as the "Facebook Pixel," is a unique string of code that companies can embed on their websites to monitor and track the actions taken by visitors to their websites and to report them back to Meta. This allows companies like Defendant to build detailed profiles about their customers and to serve them with highly targeted advertising.

---

[18]     *See* Facebook, "Company Info," available at https://about.fb.com/company-info./.

49.     Additionally, the Meta Pixel installed on a company's website allows Meta to "match [] website visitors to their respective Facebook User accounts."[19]  This is because Meta has assigned to each of its users an "FID" number—a unique and persistent identifier that allows anyone to look up the user's unique Meta profile and is thus capable of identifying the user by name[20]—and because each transmission of information made from a company's website to Meta via the Meta Pixel is accompanied by, *inter alia*, the FID of the website's visitor.

50.     As Meta's developer's guide explains, installing the Meta Pixel on a website allows Meta to track actions that users with Meta accounts take on the site. Meta states that "Examples of [these] actions include adding an item to their shopping cart or making a purchase."[21]

51.     Meta's Business Tools Terms govern the use of Meta's Business Tools, including the Meta Pixel.[22]

52.     Meta's Business Tools Terms state that website operators may use Meta's Business Tools, including the Meta Pixel, to transmit the "Contact Information" and "Event Data" of their website visitors to Meta.

---

[19]     Meta, *Get Started—Meta Pixel*, available at https://developers.facebook.com/docs/meta-pixel/get-started/.

[20]     For example, Mark Zuckerberg's FID is reportedly the number "4," so logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck, and all of the additional personally identifiable information contained therein.

[21]     Meta, *About Meta Pixel*, available at https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[22]     Meta, *Meta Business Tools Terms*, available at https://www.facebook.com/legal/technology_terms.

53.     Meta's Business Tools Terms define "Contact Information" as "information that personally identifies individuals, such as names, email addresses, and phone numbers . . . ."[23]

54.     Meta's Business Tools Terms state: "You instruct us to process the Contact Information solely to match the Contact Information against user IDs [e.g., FIDs] ("Matched User IDs"), as well as to combine those user IDs with corresponding Event Data."[24]

55.     The Business Tools Terms define "Event Data" as, *inter alia*, "information that you share about people and the actions that they take on your websites and apps or in your shops, such as visits to your sites, installations of your apps, and purchases of your products."[25]

56.     Website operators use the Meta Pixel to send information about visitors to their websites to Meta.  Every transmission to Meta accomplished through the Meta Pixel includes at least two elements: (1) the website visitor's FID and (2) the webpage's URL triggering the transmission.

57.     Depending on the configuration of the Meta Pixel, the website may also send Event Data to Meta.  Defendant has configured the Meta Pixel on its Websites to send Event Data to Meta.

58.     When website operators make transmissions to Meta through the Meta Pixel, none of the following categories of information are hashed or encrypted: the visitor's FID, the website URL, or the Event Data.

---

[23]     *Id*.

[24]     *Id*.

[25]     *Id*.

59.     Every website operator installing the Meta Pixel must agree to the Meta Business Tools Terms.[26]

60.     Moreover, the Meta Pixel can follow a consumer to different websites and across the Internet even after the consumer's browser history has been cleared.

61.     Meta has used the Meta Pixel to amass a vast digital database of dossiers comprised of highly detailed personally identifiable information about each of its billions of users worldwide, including information about all of its users' interactions with any of the millions of websites across the Internet on which the Meta Pixel is installed.  Meta then monetizes this Orwellian database by selling advertisers the ability to serve highly targeted advertisements to the persons whose personal information is contained within it.

62.     Simply put, if a company chooses to install the Meta Pixel on its website, both the company who installed it and Meta (the recipient of the information it transmits) are then able to "track [] the people and type of actions they take,"[27] including, as relevant here, the subscription to access prerecorded video material or the specific prerecorded video material that they purchase on Defendant's Websites.

63.     During the purchase process on Defendant's Websites, Defendant uses—and has used at all times relevant hereto—the Meta Pixel to disclose to Meta the unencrypted FID of the person who made the purchase and the subscription title or specific title of video material that the person purchased (as well as the URL where such video material is available for purchase).

---

[26]     *See id.*

[27]     Meta, *Retargeting: How to Advertise to Existing Customers with Ads on Facebook*, available at https://www.facebook.com/business/goals/retargeting?checkpoint_src=any.

64.     In order to take advantage of the targeted advertising and other informational and analytical services offered by Meta, Defendant programmed its Websites (by following step-by-step instructions from Meta's website) to include the Meta Pixel code, which systematically transmits to Meta the FID of each person with a Meta account who purchases prerecorded video material on Defendant's Websites, along with the subscription or the specific title of the prerecorded video material that the person purchased.

65.     With only a person's FID and the subscription purchase or the title of the prerecorded video material (or URL where such material is available for purchase) that the person purchased from Defendant on its Websites—all of which Defendant knowingly and systematically provides to Meta—any ordinary person could learn the identity of the person to whom the FID corresponds and the subscription or the title of the specific prerecorded video material that the person purchased (and thus requested and obtained).  This can be accomplished simply by accessing the URL www.facebook.com/ and inserting the person's FID.

66.     Defendant's practice of disclosing the Private Video Information of its customers to Meta continued unabated for the duration of the two-year period preceding the filing of this action.  At all times relevant hereto, whenever Plaintiff or any other person purchased a subscription to access prerecorded video material or prerecorded video material from Defendant on its Websites, Defendant disclosed to Meta (*inter alia*) the subscription or the specific title of the video material that was purchased (including the URL where such material is available for purchase), along with the FID of the person who purchased it (which, as discussed above, uniquely identified the person).

67.     At all times relevant hereto, Defendant knew the Meta Pixel was disclosing its customers' Private Video Information to Meta.

68.     Although Defendant could easily have programmed its Websites so that none of its customers' Private Video Information is disclosed to Meta, Defendant instead chose to program its Websites so that all of its customers' Private Video Information is disclosed to Meta.

69.     Before transmitting its customers' Private Video Information to Meta, Defendant failed to notify any of them that it would do so, and none of them have ever consented (in writing or otherwise) to these practices.

70.     By disclosing to Meta Plaintiff's and its other customers' FIDs together with the subscription purchase or the specific video material that they each purchased, without any of their consent to these practices, Defendant violated the VPPA on an enormous scale.

### B.  The Insight Tag

71.     LinkedIn operates the www.linkedin.com website, which is the "world's largest professional network with more than 1 billion members in more than 200 countries and territories worldwide."[28]

72.     LinkedIn has created and offers its own tracking technology called the Insight Tag, which operates similarly to the Meta Pixel. LinkedIn describes the Insight Tag as "[a] simple code snippet added to [a] website [that] can help you optimize your campaigns, retarget your website visitors, and learn more about your audiences."[29]

73.     The Insight Tag loads a small library of functions onto a website via the code, which website operators like Defendant can use to track LinkedIn ad-driven visitor activity across websites by relying on LinkedIn cookies that enable LinkedIn to match your website visitors to

---

[28]     LinkedIn, *About LinkedIn*, available at https://about.linkedin.com/.

[29]     LinkedIn, *Business—Insight Tag*, available at https://business.linkedin.com/marketing-solutions/insight-tag.

their respective LinkedIn member accounts.[30] LinkedIn uses several cookies for the purpose of identifying users, including: "li_at," "User Match History," "li_sugr," and "bscookie."[31] The Insight Tag's default configuration is to track visits to a particular website, including the "URL, buttons clicked, referrer, IP address, device and browser characteristics (User Agent), and timestamp."[32] The Insight Tag also tracks and transmits to LinkedIn a website visitor's email address.

74.     As LinkedIn further explains, website operators may enable "enhanced" matching, which allows them to send emails associated with the respective visits to LinkedIn by simply operating the Insight Tag.[33]

75.     The Insight Tag also collects "Event Data" which is defined, *inter alia*, as all actions automatically captured and tagged, including "button clicks, page visits, and form submissions[] taken on your website."[34]

76.     LinkedIn's Business Guide warns against installing "the Insight Tag . . . on consumer pages for certain types of medications or pages where users manage their financial accounts and transactions or medical appointments, since it could lead to the inadvertent collection and sharing of sensitive information regarding the health or finances of individuals who visited

---

[30]     *See id.*

[31]     LinkedIn, *LinkedIn Cookie Table*, available at https://www.linkedin.com/legal/l/cookie-table#authentication.

[32]     LinkedIn, *Business—Installing and Using the LinkedIn Insight Tag*, available at https://business.linkedin.com/marketing-solutions/insight-tag.

[33]     LinkedIn, *LinkedIn Insight Tag FAQs*, available at https://www.linkedin.com/help/linkedin/answer/a427660.

[34]     LinkedIn, *Understanding Website Actions*, available at https://www.linkedin.com/help/lms/answer/a1377941.

that page."[35]  Despite this admonition, Defendant installed the Insight Tag on its Websites without limitation, despite the VPPA's prohibition on disclosing to third parties the sort of personally identifiable video viewing information at issue in this case.

77.     Every transmission of information by a website operator to LinkedIn accomplished through the Insight Tag includes at least two elements: (1) the website visitor's email address and device identifiers (including stored cookies) and (2) the webpage's URL triggering the transmission.

78.     When website operators make transmissions to LinkedIn through the Insight Tag, none of the following categories of information are hashed or encrypted: the visitor's email address, the website URL, or the Event Data.

79.     Moreover, the Insight Tag can follow a consumer to different websites and across the Internet even after the consumer's browser history has been cleared.

80.     Simply put, if a company chooses to install the Insight Tag on its website, both the company who installed it and LinkedIn (the recipient of the information it transmits) are then able to "track conversions, retarget, and get real-time insights on the professional traits and content preferences of your website visitors,"[36] including, as relevant here, the subscription to access prerecorded video material or the specific prerecorded video material that they purchase on Defendant's Websites.

---

[35]     LinkedIn, *Set Up Conversion Tracking for Insight Tag Conversions*, available at https://www.linkedin.com/help/lms/answer/a425606.

[36]     LinkedIn, *Retargeting*, available at https://business.linkedin.com/marketing-solutions/ad-targeting/retargeting?trk=nw_ml_ma.

81. Defendant has configured the Insight Tag on its Websites to send Event Data (including data identifying persons who request or obtain particular prerecorded video services or products) and email addresses to LinkedIn.

82. During the purchase process on Defendant's Websites, Defendant uses—and has used at all times relevant hereto—the Insight Tag to disclose to LinkedIn the email addresses and device identifiers (including stored cookies) of the consumers who request or obtain prerecorded video services or products (including subscriptions to view such material) on its Websites, along with the title or specific title of the prerecorded video product or service that the consumer requested or obtained, including purchased, as well as the URL where such product or service is available.

83. In order to take advantage of the targeted advertising and other informational and analytical services offered by LinkedIn, Defendant programmed its Websites (by following step-by-step instructions from Linkedin) to include the Insight Tag code, which systematically transmits to LinkedIn the email addresses and device identifiers (including stored cookies) of the consumers who requested or obtained prerecorded video products or services (including subscriptions to view such materials) along with the subscription title or specific title of video product or service that the consumer purchased.

84. With only a person's email address and the title of the specific subscription or other prerecorded video product or service purchased on any of Defendant's websites (as identified in a URL where such material is available for purchase)—all of which Defendant knowingly and systematically transmitted to LinkedIn—LinkedIn, along with any ordinary person, could learn the identity of the person to whom the email address corresponds and the specific video materials or services that the person purchased (and thus requested and obtained) from Defendant.

85.     Defendant's practice of disclosing the Private Video Information of its customers to LinkedIn continued unabated for the duration of the two-year period preceding the filing of this action.  At all times relevant hereto, whenever Plaintiff or any other person purchased prerecorded video material or services (including a subscription to view such materials) from Defendant on its Websites, Defendant disclosed to LinkedIn information (including the URL of a particular webpage on one of Defendant's Websites) that revealed the specific video material or service (such as the title of a subscription to view such material) that was purchased, along with the email address and other unique identifiers (including stored cookies) of the person who made such purchase or otherwise requested or obtained such material or service.

86.     At all times relevant hereto, Defendant knew the Insight Tag installed on its Websites was disclosing the Private Video Information of persons who had purchased prerecorded video materials or services on its Websites (including subscriptions to view such materials) to LinkedIn.

87.     Although Defendant could easily have programmed its Websites so that none of its customers' Private Video Information is disclosed to LinkedIn, Defendant instead chose to program its Websites so that all of its customers' Private Video Information is disclosed to LinkedIn.

88.     Before transmitting its customers' Private Video Information to LinkedIn, Defendant failed to notify any of them that it would do so, and none of them have ever consented (in writing or otherwise) to these practices.

89.     By knowingly disclosing to LinkedIn information (including the URL of a particular webpage on one of Defendant's Websites) that revealed the specific video materials or services (such as the titles of subscriptions to view such materials) that persons purchased, along

with the email addresses and other unique identifiers (including stored cookies) of the persons who made such purchases or otherwise requested or obtained such materials or services, without first obtaining persons' consent to these practices, Defendant violated the VPPA on an enormous scale.

## CLASS ACTION ALLEGATIONS

90.     Plaintiff seeks to represent a class defined as all persons in the United States who, during the two years preceding the filing of this action continuing through the date of any order granting class certification, purchased a prerecorded video or subscription to access prerecorded videos from one of Defendant's Websites and whose Private Video Information pertaining to such purchase was transmitted by Defendant to Meta Platforms, Inc. or LinkedIn Corporation.

91.     Class members are so numerous that their individual joinder herein is impracticable. On information and belief, there are hundreds of thousands of Class members. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined from the records of Defendant, Meta, and LinkedIn. Class members may be notified of the pendency of this action by mail and/or publication through the records of Defendant, Meta, and LinkedIn.

92.     Common questions of law and fact exist for all Class members and predominate over questions affecting only individual class members. Common legal and factual questions include but are not limited to (a) whether the videos or subscriptions to access videos sold by Defendant on the Websites constitute "videos materials or services" within the meaning of the VPPA; (b) whether Defendant is a "video tape service provider" under the VPPA; (c) whether Plaintiff and Class members are "consumers" under the VPPA; (d) whether Defendant disclosed Plaintiff's and Class members' "personally identifiable information," within the meaning of the VPPA, to Meta or LinkedIn in connection with such persons' purchases of the videos or

subscriptions to access such materials offered for sale on the Websites; (e) whether such disclosures were made by Defendant knowingly; (f) whether Defendant obtained the "informed, written consent," as defined by the VPPA, of Plaintiff and Class members prior to making such disclosures; (g) whether Defendant's conduct violated the VPPA; and (h) the relief, including the aggregate sum of statutory damages, to which Plaintiff and Class members are entitled as a result of Defendant's violations of the VPPA.

93.     The named Plaintiff's claims are typical of the claims of the Class in that the Defendant's conduct toward the putative class is the same. That is, Defendant used Tracking Technologies to monitor and track the same actions taken by consumers on the same Websites, and to report such information to the same third parties.  Further, as a result of Defendant's uniform and wrongful conduct in knowingly disclosing its customers' Private Video Information to third parties, the named Plaintiff and all Class members suffered the same invasion of their statutorily protected right to privacy (as afforded by the VPPA), as well as the same form of intrusion upon their private affairs and concerns that would be highly offensive to a reasonable person.

94.     Plaintiff is an adequate representative of the Class because she is interested in the litigation; her interests do not conflict with those of the Class members she seeks to represent; she has retained competent counsel experienced in prosecuting class actions; and she intends to prosecute this action vigorously.  Plaintiff and her counsel will fairly and adequately protect the interests of all Class members.

95.     The class mechanism is superior to other available means for the fair and efficient adjudication of Class members' claims. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation

necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by this case's complex legal and factual issues.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication of the common questions of law and fact, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**CLAIM FOR RELIEF**
**Violation of the Video Privacy Protection Act, 18 U.S.C. § 2710**
**(By Plaintiff, Individually and on Behalf of the Class, Against Defendant)**

96.     Plaintiff repeats the allegations set forth in the preceding paragraphs as if fully set forth herein.

97.     The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifiable information" concerning any "consumer" to a third party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

98.     As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials[.]" Defendant is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it is engaged in the business of selling and delivering prerecorded videos and subscriptions to access prerecorded videos to consumers nationwide.

99.    As defined in 18 U.S.C. § 2710(a)(1), a "'consumer' means any renter, purchaser, or consumer of goods or services from a video tape service provider." As alleged above, Plaintiff and Class members are each a "consumer" within the meaning of the VPPA because they each purchased or rented a prerecorded video or purchased, rented, or subscribed to a service to access prerecorded videos from Defendant on one of its Websites.

100.    As defined in 18 U.S.C. § 2710(a)(3), "'personally identifiable information' includes "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." The Private Video Information that Defendant transmitted to third parties constitutes "personally identifiable information" as defined in 18 U.S.C. § 2710(a)(3) because it was capable of identifying Plaintiff and each of the Class members to third parties as an individual who purchased or rented a specific prerecorded video or who purchased, rented, or subscribed to a specific service to access prerecorded videos from Defendant on its Websites. Specifically, the FID disclosed to Meta through the Meta Pixel identified Plaintiff and Class members by connecting the prerecorded video material or services (by title and URL, where available for purchase) they had purchased (or otherwise requested or obtained) to each of their respective Facebook profiles, which contained their names and other personally identifying information.  Additionally, the email addresses and device identifiers (including stored cookies) disclosed to LinkedIn through the Insight Tag identified Plaintiff and Class members by connecting the prerecorded video material or services (by title and URL, where available for purchase) they had purchased (or otherwise requested or obtained) to each of their LinkedIn profiles, which contained their names and other personally identifying information.

101.    Defendant installed and programmed the Meta Pixel and Insight Tag on its Websites knowing that these Tracking Technologies would thereafter systematically and

automatically transmit the Private Video Information of its customers to Meta and LinkedIn. Thus, Defendant knowingly disclosed Plaintiff's and Class members' Private Video Information to third parties via the Tracking Technologies.

102.    Defendant failed to obtain the requisite "informed, written consent" of Plaintiff or any Class members to authorize its disclosure of their Private Video Information to LinkedIn, Meta, or any other third party.  More specifically, at no time prior to or during the applicable statutory period did Defendant obtain from any person who purchased prerecorded video material or a subscription to access prerecorded video material or services on its Websites (including Plaintiff or Class members) the person's informed, written consent, given in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer, given at the time the disclosure is sought or in advance for a set period of time (not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner), or given after Defendant provided an opportunity, in a clear and conspicuous manner, for the consumer to withdraw consent on a case-by-case basis or to withdraw consent from ongoing disclosures, at the consumer's election. *See* 18 U.S.C. § 2710(b)(2).

103.    By knowingly disclosing Plaintiff's and Class members' Private Video Information to third parties, Defendant violated these persons' statutorily protected rights to privacy in their Private Video Information and is liable to Plaintiff and each Class member for damages in the statutorily set sum of $2,500. 18 U.S.C. § 2710(c)(2)(A).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks a judgment against Defendant Cengage Learning, Inc. as follows:

a) For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

b) For an order declaring that Defendant's conduct as described herein violated the VPPA;

c) For an order finding in favor of Plaintiff and the Class and against Defendant on all counts asserted herein;

d) For an award of $2,500.00 to Plaintiff and each Class member, as provided by 18 U.S.C. § 2710(c);

e) For an order permanently enjoining Defendant from disclosing the Private Video Information of its subscribers to third parties in violation of the VPPA;

f) For prejudgment interest on all amounts awarded; and

g) For an order awarding punitive damages, reasonable attorneys' fees, and costs to counsel for Plaintiff and the Class under Rule 23 and 18 U.S.C. § 2710(c).


Dated: December 7, 2025               Respectfully submitted,

                                      /s/ Daniel J. O'Connor Jr.

                                      **O'CONNOR, HASELEY & WILHELM LLC**

                                      Daniel J. O'Connor Jr.
                                      Ohio Bar No. 91397
                                      O'Connor, Haseley & Wilhelm LLC
                                      470 W. Broad St., Suite 15
                                      Columbus, OH 43215
                                      Telephone: (614) 572-6762
                                      Facsimile: (614) 937-8872
                                      doconnor@goconnorlaw.com

                                      and

**HEDIN LLP**

Frank S. Hedin (*pro hac vice* forthcoming)
Elliot O. Jackson (*pro hac vice*)
Florida Bar No. 1034536
HEDIN LLP
1395 Brickell Ave., Suite 610
Miami, Florida 33131-3302
Telephone: (305) 357-2107
Facsimile: (305) 200-8801
fhedin@hedinllp.com
ejackson@hedinllp.com

*Counsel for Plaintiff and Putative Class*